[L. A. No. 4591.    In Bank.—August 28, 1917.]

CITY OF LOS ANGELES (a Municipal Corporation), et al., Respondents, v. WALTER A. LEWIS, Auditor, etc., Appellant; M. H. KANE, Intervener and Appellant.

TAXATION — PRIVATE PURPOSE — UNCONSTITUTIONAL LEGISLATION.— A legislative act authorizing taxation for a private purpose is unconstitutional, as under our system of government taxes can be laid only for a public object.

COUNTIES—POWERS OF BOARDS OF SUPERVISORS.—The general provision of section 4041 of the Political Code which circumscribes all grants of power to boards of supervisors within "such limitations and restrictions as are prescribed by law," neither adds to or detracts from the force and effect of the powers granted.

STATUTORY CONSTRUCTION — CONSTITUTIONALITY — POWER OF COURT.— While in construing a legislative enactment a court will enter upon that construction with strong predilection favoring its constitutionality and seek by every legitimate means to put an interpretation on the law which will confirm its constitutionality, there is a well-defined limit to every court's power in that regard, and no court in its effort to save a law can properly pervert or destroy its plain meaning and so make it express that which the legislature itself did not declare

COUNTIES — ACQUISITION AND OPERATION OF CEMENT MANUFACTURING
PLANT—SALE OF PRODUCTS—VOID CODE PROVISION.—Section 4041,
subdivision 9a, of the Political Code, authorizing boards of super-
visors to purchase, lease, construct, or otherwise acquire, own, operate,
manage, and control, in any county of the state, a cement manufac-
turing plant and to sell the products of the same in such manner and
upon such terms and conditions as to them shall be deemed proper,
provided that the state and municipal or public corporations of the
state shall have a preferred right at the same price as the products
are offered to private persons to purchase the same, is void, as
authorizing taxation for a private purpose.

APPEAL from a judgment of the Superior Court of Los
Angeles County.  Paul J. McCormick, Judge.

The facts are stated in the opinion of the court.

O'Melveny, Stephens & Millikin, Walter K. Tuller, and J. P.
Chandler, for Intervener and Appellant.

Fredericks & Hanna, for Respondent-Defendant and
Appellant.

Albert Lee Stephens, City Attorney, W. B. Mathews, A. J.
Hill, County Counsel, Roy V. Reppy, Assistant City Counsel,
and Robert B. Murphy, Deputy County Counsel, for Petition-
ers-Plaintiffs and Respondents.

MELVIN, J.—The city of Los Angeles was the owner of a
plant for the manufacture of Portland cement, located in Kern
County, California.  It had used the product of its factory in
the construction of its waterworks.  Thereafter, in 1913,
[Stats. 1913, p. 669], the legislature of the state, in its
enumeration of the powers of board of supervisors, added a
new subdivision to section 4041 of the Political Code (subd.
9a), providing as follows: "To purchase, lease, construct or
otherwise acquire, own, operate, manage and control, in any
county in the state, cement manufacturing plant; and to sell
the products of the same in such manner and upon such terms
and conditions as to them shall be deemed proper; *provided,*
that the state of California and municipal or public corpora-
tions of the state shall have a preferred right at the same price
as the products are offered to private persons to purchase the
same; and to purchase, lease, or otherwise acquire real or

personal property to be used in connection with such plant; *provided, however,* that no such plant shall be purchased, leased or otherwise acquired, neither shall said works be constructed on real or personal property purchased or acquired until notice of the intention to make such purchase or construct such works shall have been given for a period of thirty days by publication in a newspaper of general circulation published within the county or, if there be none, then by posting a notice for said period in a conspicuous place in three public places in the county; such notice shall contain a description of the property to be purchased or works to be constructed, a statement of the amount of money to be invested, the terms upon which it is to be invested and the time when the proposition will come before the board of supervisors to be acted upon.'' Then on July 10, 1915, the city of Los Angeles and the county of Los Angeles, acting under the authority thus conferred, entered into a written contract of lease, whereby the county of Los Angeles took over the operation and control of the city's cement plant located in the county of Kern. The lease contained a number of terms and conditions, some of which will hereinafter demand consideration. For the present it is enough to say that the rental to be paid by the county of Los Angeles to the city of Los Angeles for the use of this cement plant for the first year is twenty-seven thousand five hundred dollars, to be paid in equal monthly installments of $2,291.66 each. In time the city of Los Angeles and its board of public service commissioners made demand upon the auditor of the county of Los Angeles to indorse his approval of the first month's installment of rent payable under this leasehold contract. Upon his refusal so to do this action in mandate was brought, and appellant M. H. Kane, as a citizen and taxpayer of the county, was permitted to intervene therein. The intervener and the auditor filed their general demurrers to the petition. These demurrers were overruled and judgment for petitioners followed. From this judgment the auditor and intervener have taken their appeals.

The first and fundamental proposition urged upon appeal is that the legislative act is itself unconstitutional, in that it clearly and designedly authorizes taxation for a private purpose, whereas under our system of government taxes can be laid only for a public object—one within the purposes for

which governments are established. Indisputably, if the legislature has authorized the doing of this thing, its authorization, under all of the authorities, is void. (Dillon on Municipal Corporations, 5th ed., sec. 1351; *Loan Assn.* v. *Topeka,* 87 U. S. 655, [22 L. Ed. 455]; *Cole* v. *La Grange,* 113 U. S. 1, [28 L. Ed. 896, 5 Sup. Ct. Rep. 416]; *In re Opinion of Supreme Judicial Court,* 58 Me. 590; *In re Opinion of ·the Justices,* 155 Mass. 598, [15 L. R. A. 809, 30 N. E. 1142]; *In re Opinion of Justices,* 211 Mass. 624, [42 L. R. A. (N. S.) 221, 98 N. E. 611]; *Union Ice & Coal Co.* v. *Town of Ruston,* 135 La. 898, [Ann. Cas. 1916C, 12, L. R. A. 1915B, 859, 66 South. 262]; *People* v. *Town of Salem,* 20 Mich. 452, [4 Am. Rep. 400]; *In re Opinion of Justices,* 204 Mass. 607, [27 L. R. A. (N. S.) 483, 91 N. E. 405]; *Attorney-General* v. *City of Eau Claire,* 37 Wis. 400; *Keen* v. *Mayor,* 101 Ga. 588, [29 S. E. 42].) Respondents in answer do not contend against the soundness of this principle, nor its applicability to the construction of the code section. They argue, however, that every court will presume in favor of the constitutionality of a legislative enactment, and wherever possible, as between two permissible constructions, will adopt that which will uphold the law, and therefore they say that this law should be construed as authorizing a county to construct, purchase, or lease a cement plant, to use its product solely for the public purposes of the county. They find confirmatory evidence of this intent in the act itself from the declaration therein contained that boards of supervisors, as to all of the powers by the legislature conferred on them, as well as to this specific grant of power, are restrained by "such limitations and restrictions as are prescribed by law." The power to sell, so respondents further argue, will then be "limited to an authority to sell the surplus cement incidentally produced."

Such are the opposing views concerning the construction of this law, and to a determination of what in fact the law actually means we are thus brought. Certain phases of the matter may be at once disposed of. The general provision of section 4041 of the Political Code, which circumscribes all grants of power to boards of supervisors within "such limitations and restrictions as are prescribed by law," neither adds to nor detracts from the force and effect of the powers granted. Even if this express language were not used, those powers would still be circumscribed by the limitations and restric-

tions prescribed by law. It is true that where a municipal corporation is authorized to engage in a work of a public nature, and where the character of that work is like that of purveying water or the production and sale of electric light and power to its inhabitants, it has been held that an excess or surplus beyond the needs of those inhabitants, which may arise in the prudent operation of the public works, may be disposed of to private individuals. (Dillon on Municipal Corporations, 5th ed., sec. 1300; *Clark* v. *City of Los Angeles,* 160 Cal. 30, [116 Pac. 722]; *South Pasadena* v. *Pasadena Land & Water Co.,* 152 Cal. 579, [93 Pac. 490].) But it must be plain that this rule or principle can only be invoked when it has first been made manifest that the primary and principal purpose is a public one. Respondents do not contend—no one can successfully contend—that the manufacture and sale of Portland cement for commercial purposes is work of a public or municipal character, any more than would be the manufacture of bricks, the manufacture of harness, of fire-engines, of ventilating apparatus, or the many hundreds of manufactured products which a municipal corporation may use in the furtherance of public affairs.

Again, while in construing a legislative enactment a court will enter upon that construction with strong predilection favoring its constitutionality and seek by every legitimate means to put an interpretation upon the law which will confirm its constitutionality, there is a well-defined limit to every court's power in this regard. No court, in its effort to save a law, can properly pervert or destroy its plain meaning, and so make it express that which the legislature itself did not declare. "But the courts cannot go beyond the province of legitimate construction in order to save a statute; and where the meaning is plain, words cannot be read into it or out of it for that purpose." (Lewis' Sutherland on Statutory Construction, sec. 83; *Rogers-Ruger Co.* v. *Murray,* 115 Wis. 267, [95 Am. St. Rep. 901, 59 L. R. A. 737, 91 N. W. 657].) Controlled by these fundamental principles of construction, no person, lawyer or layman, reading this provision could entertain the slightest doubt as to the power which the legislature conferred and meant to confer upon boards of supervisors. In brief, it was an authorization to any county in the state to purchase, lease, construct, or otherwise acquire, own, and operate any cement manufacturing plant, in its own or in

any other county of the state, and to engage in the business of manufacturing and selling cement to any and every purchaser. Says the statute itself, "to sell the products of the same in such manner and upon such terms and conditions as to them shall be deemed proper." The only limitation upon this otherwise absolutely free power of manufacture and sale is that the state and its municipal and other public corporations shall have a preferred right to purchase the cement "at the same price as the products are offered to private persons." There is in this not only no limitation of manufactuure and use for the public needs of the county only, but there is every contemplation that the manufacture shall exceed the uses of a county, and this must necessarily have been in the mind of the legislature, since the act places no restriction upon a county as to the magnitude of the plant which it may see fit to acquire. There is no provision that the plant shall bear any relation to the actual or estimated public needs of the county purchasing it. The county of Mono, requiring, let us say, for its public needs the use of one thousand barrels of cement a year, may purchase or lease a plant whose output is one thousand barrels of cement a day. It requires no technical knowledge of this or of any other manufacturing industry to know that economy of production bears a direct ratio to efficiency of operation, and that the cost of production is lessened the more nearly that any manufacturing plant is operated to its maximum of production. Precisely, therefore, as any county operating any cement plant must employ skilled business methods to make the output of that plant as large as possible, so was this clearly in the contemplation of the legislature when it conferred powers absolutely unrestricted (save in the dealings with the state and its mandatories in the matter of the sale of its surplus product). Moreover, from the nature of that product itself, there could be, if force be given to respondents' construction of the act, no "surplus cement incidentally produced" demanding private sale, as is not infrequently the case in the public supply of water or hydro-electric energy. Portland cement is a product which can be carried over without deterioration. The necessary products for the needs of a county for a given year can unquestionably be closely estimated in advance by the county authorities. Their factory can, therefore, manufacture that amount and no more. But if there should chance to be an

incidental surplus, the exigencies of the situation do not demand that that surplus should be sold, since it may safely and economically be carried over for next year's consumption. The theory, therefore, of a surplus "incidentally produced" is as wholly without reason as it is wholly without the purview of the law under review, which at least is founded upon the sound business principle that the county shall manufacture all the cement of which its plant is capable, and which manifestly does not contemplate that a county shall commit business hari-kari by purchasing or building a cement plant with a capacity of a thousand barrels a day to supply its needs of a thousand barrels a year, with authority to sell only the small surplus over the thousand barrels a year which may be "incidentally produced." What the legislature did was to authorize the counties of the state to engage in the general business of the manufacture and sale of Portland cement, without restriction or attempt or desire to restrict these counties to their individual public needs. And whatever change in position the exigencies of the law have forced the attorneys for the city of Los Angeles to take, it is quite apparent from a reading of the lease between the city and the county that such was the interpretation which the contracting parties put upon the law at the time they entered into their agreement.

It has been said that to save even a legislative enactment nothing can be read into it nor read out of it. The supreme test of the validity of any such law is not what may have been done under it, not, as here, what the contracting parties may by convention agree to do or not to do under it, but it is what *may be* done under it. (Lewis' Sutherland on Statutory Construction, sec. 107; *City of Beatrice* v. *Wright*, 72 Neb. 689, [101 N. W. 1039]; *State* v. *Stark Co.*, 14 N. D. 368, [103 N. W. 913]; *Stuart* v. *Palmer*, 74 N. Y. 183, [30 Am. Rep. 289]; *Minneapolis Brewing Co.* v. *McGillivray*, 104 Fed. 258; *State* v. *O'Leary*, 43 Mont. 157, [115 Pac. 204].) No man can doubt but that under this law a county acquiring a cement plant is authorized to manufacture all of the cement which that plant can produce and sell all that it desires to private consumers. To deny this right and power under the law is to destroy the law itself and to frame a law distinctly the contrary of that which the legislature deliberately and advisedly formulated and passed. So plain is this that re-

spondents cannot successfully urge the severability of the statute and that a part of it can be saved by a construction limiting the cement production to the public needs of the county. For this, as we have said, would be to make a law which the legislature has not made and which requires legislative deliberation and determination before it can be made.

The invalidity of the subdivision of the code section thus declared renders unnecessary any detailed consideration of the contract entered into between the city of Los Angeles and the county of Los Angeles. But in exemplification of the statement above made, that the contracting parties did not in their agreement contemplate that the law designed to limit the manufacture of cement to the county needs, it may be pointed out that by the terms of the lease the county is bound to manufacture a total of one hundred and eighty thousand barrels of cement each year, and this without regard to the county requirements. The county may require much or little, or none at all, but it must manufacture this product and either sell it or suffer tremendous financial loss if it does not do so. Not this alone, but the city, in lieu of the cash rent which the county is to pay for the use of the plant, may exact from the county the manufacture and delivery to it—the city—of cement at an agreed price. The county further agrees to pay a royalty of five and five-sixths cents per barrel on every barrel of cement manufactured. It is also to pay a depreciation charge of eleven thousand dollars a year. The city is to have the right to purchase sixty thousand barrels of cement a year at a price fixed in the lease, without regard to what may be the actual market value of Portland cement at the time the city elects to take it. All of this and much more indicate too plainly to call for discussion the fact that the contracting parties viewed this law as only it can be regarded, and for the reasons given the judgment in favor of these respondents and against the defendant auditor of Los Angeles and against the intervener is reversed and the cause remanded, with directions to the trial court to sustain these appellants' general demurrers to petitioner's complaint.

Henshaw, J., Lorigan, J., Shaw, J., Sloss, J., and Angellotti, C. J., concurred.

Rehearing denied.