[No. A084485. First Dist., Div. Four. Oct. 26, 1999.]

RICHARD D. WILSON et al., Plaintiffs and Appellants, v.
STATE BOARD OF EDUCATION, Defendant and Respondent;
CALIFORNIA NETWORK OF EDUCATIONAL CHARTERS, Intervener
and Respondent.

1128

## COUNSEL

Lynn S. Carman for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Stephanie Wald and Douglas M. Press, Deputy Attorneys General, for Defendant and Respondent.

Remcho, Johansen & Purcell, Joseph Remcho, James C. Harrison; Nielsen, Merksamer, Parrinello, Mueller & Naylor, John E. Mueller and James R. Parrinello for Intervener and Respondent.

John H. Findley and Sharon L. Browne for Pacific Legal Foundation and Pacific Research Institute as Amici Curiae on behalf of Defendant and Respondent and Intervener and Respondent.

## OPINION

**REARDON, J.**—"Charter schools are grounded in private-sector concepts such as competition-driven improvement . . . , employee empowerment and customer focus. But they remain very much a public-sector creature, with in-bred requirements of accountability and broad-based equity. Simple in theory, complex in practice, charter schools promise academic results in return for freedom from bureaucracy." (Com. on Cal. State Gov. Organization and Economy, rep., The Charter Movement: Education Reform School by School (Mar. 1996) p. 1 (Little Hoover Report).)

Charter schools are a phenomenon of the 1990's. With the Charter Schools Act of 1992,[1] California became the second state to enact charter school legislation. (RPP Internat. & U. of Minn., A Study of Charter Schools, First-Year Rep., Of. of Ed. Research & Improvements, Dept. Ed.

---

[1]The Charter Schools Act of 1992 was added by Statutes 1992, chapter 781, section 1, page 3756, and is found at part 26.8 of the Education Code, section 47600 et seq. (hereafter the Charter Schools Act or the Act).

Unless otherwise indicated, all statutory references are to the Education Code.

(1997).) Last year, the Legislature fine-tuned the program.[2] Since the close of briefing, new provisions have been added.[3]

Troubled by what they see as a multifaceted assault on the California Constitution, appellants[4] aim to halt the march of the charter school movement in California through a facial challenge to the Charter Schools Act and Assembly Bill No. 544. They have petitioned for a writ of mandate commanding the Board to refrain from (1) granting any charters under Assembly Bill No. 544 or the original legislation, and (2) expending any public funds in implementing those laws. Their petition has been denied. On appeal appellants roll out a slate of errors. None have merit.

## I. STATUTORY FRAMEWORK

### A. *The Original Enactment*

Anyone closely allied with a public school—whether a parent or family member of a student, or a teacher, administrator or classified staff member—can attest to the perils resident in the complex tangle of rules sustaining our public school system. These include the potential to sap creativity and innovation, thwart accountability and undermine the effective education of our children.

The 1992 legislation sought to disrupt entrenchment of these traits within the educational bureaucracy by encouraging the establishment of charter schools. Specifically, it permitted the founding of 100 charter schools statewide and up to 10 in any district. These schools would be free from most state laws pertaining uniquely to school districts. Each would receive a five-year revocable charter upon successful petition to the school district governing board or county board of education, signed by a specified percent of teachers. (Former §§ 47602, subd. (a), 47605, 47607, as added by Stats. 1992, ch. 781, § 1, pp. 3756-3761;[5] § 47610.)

The original enactment set out six goals: (1) improving pupil learning; (2) increasing learning opportunities, especially for low-achieving students; (3) encouraging use of different and innovative teaching methods; (4) creating

---

[2]Assembly Bill No. 544 (1997-1998) enacted as Statutes 1998, chapter 34, sections 1-19, amended and added new provisions to the Act.

[3]Senate Bill No. 434 (1998-2000 Reg. Sess.) enacted as Statutes 1999, chapter 162, sections 1, 2, effective January 1, 2000.

[4]Appellants are Richard D. Wilson and Fernando Ulloa, residents and taxpayers of San Francisco and Marin Counties, respectively. Respondent is the State Board of Education (Board); intervener is the California Network of Educational Charters.

[5]Hereafter, references to former section means those sections as added by Statutes 1992, chapter 781, section 1, pages 3756-3761.

new professional opportunities for teachers, including being responsible for the school site learning program; (5) providing parents and students with more choices in the public school system; and (6) holding schools accountable for measurable pupil outcomes and providing a way to change from rule-based to performance-based accountability systems.[6] (Former § 47601.)

Charter schools nonetheless were—and are—subject to important restraints: (1) they must be nonsectarian in their programs, admission policies, employment practices, and all other operations (former § 47605, subd. (d) [now § 47605, subd. (d)(1)]); (2) charter schools cannot charge tuition or discriminate against any student on the basis of ethnicity, national origin, gender or disability (*ibid.*); and (3) no private school can be converted to a charter school (former [and current] § 47602, subd. (b)).

The petition to establish a charter school was, and is, a comprehensive document which must, among other items, set forth (1) a description of the educational program; (2) student outcomes and how the school intends to measure progress in meeting those outcomes; (3) the school's governing structure; (4) qualifications of employees; (5) procedures to ensure the health and safety of students and staff; (6) means of achieving racial and ethnic balance among its students that reflects the general population within the territory of the school district; (7) admission requirements, if applicable; (8) annual audit procedures; (9) procedures for suspending and expelling students; and (10) attendance alternatives for students who choose not to attend charter schools. (Former § 47605, subd. (b) [now § 47605, subd. (b)(5)].)

Under the 1992 scheme, upon receiving a duly signed charter petition and convening a public hearing on its provisions, the school district had discretion to grant or deny the charter. (Former § 47605, subd. (b).) The granting of a charter exempted the school from laws governing school districts except, at the school's option, provisions concerning participation in the state teacher's retirement system. (Former §§ 47610, 47611.) Denial of a charter could trigger procedures for reconsideration, at petitioner's request. (Former § 47605, subd. (j)(1), (3).)

Charter schools were, and are, required to meet statewide performance standards and conduct certain pupil assessments. (Former § 47605, subd. (c) [now § 47605, subd. (c)(1)].) The chartering authority could, and can, revoke a charter for various deficiencies including charter or legal violations and failure to meet student outcomes. (Former [and current] § 47607, subd. (b).)

[6]Assembly Bill No. 544 (1997-1998 Reg. Sess.) adds a seventh goal: "Provide vigorous competition within the public school system to stimulate continual improvements in all public schools." (§ 47601, subd. (g).)

B. *Assembly Bill No. 544*

Assembly Bill No. 544 substantially revamped the 1992 enactment. Gone is the cap of 100 charter schools, replaced with a 1998-1999 school year cap of 250, with 100 more authorized each successive school year. (§ 47602, subd. (a).)

Gone too is the exclusive reliance on teacher signatures to start the petition process. Now, a petition is valid if signed by the number of parents/guardians equal to at least half of the estimated students, or the number of teachers equal to at least half the teachers expected to be employed. (§ 47605, subd. (a)(1).) The petition must display a statement that the signator is "meaningfully interested" in sending his or her child to, or teaching at, the charter school, as the case may be. (*Id.*, subd. (a)(3).) Petitions for the conversion of an existing public school to a charter school must be signed by at least half of the permanent status teachers currently employed at the school. (*Id.*, subd. (a)(2).)

Gone also is the broad discretion in granting or denying a charter. Now, following review of the petition and the requisite public hearing, the governing board of the district "shall not deny a petition" unless it makes written findings of fact that: (1) The charter school presents an unsound educational program; (2) petitioners are "demonstrably unlikely" to succeed in implementing the program; or (3) the petition lacks the required signatures, affirmations or descriptions of program particulars. (§ 47605, subd. (b).) If the school district nonetheless denies a petition, the petitioner can submit to the county board of education or the Board. (*Id.*, subd. (j)(1).) Additionally, petitioner can submit directly to the county board of education for a charter school that would serve pupils otherwise directly served by the county office of education. (§ 47605.5.)

As well, the amendments permit a charter school to operate as a nonprofit benefit corporation, with the school district granting the charter entitled to one representative on the board of directors. (§ 47604, subds. (a), (b).)

Now, the Board itself, upon recommendation of the Superintendent of Public Instruction (Superintendent), can take "appropriate action," including revoking the charter of any school, if it finds "[g]ross financial mismanagement" (§ 47604.5, subd. (a)); "[i]llegal or substantially improper" use of funds (*id.*, subd. (b)); or that "[s]ubstantial and sustained departure" from successful practices jeopardizes the educational development of the students (*id.*, subd. (c)).

Other new provisions include the following: (1) No funds will be given for any pupil who also attends a private school that charges his or her family

for tuition (§ 47602, subd. (b)); (2) all charter schoolteachers must hold a Commission on Teaching Credentialing certificate or equivalent (§ 47605, subd. (*l*)); (3) petitioners must provide the chartering authority with financial statements that include a proposed first-year operational budget and three-year cash-flow and financial projections (*id.,* subd. (g)); (4) charter schools must use generally accepted accounting principles in conducting the required annual financial audits, and any exceptions or deficiencies identified during the audit must be resolved to the satisfaction of the chartering authority (*id.,* subd. (b)(5)(I)).

Concerning accountability, charter schools must "promptly respond to all reasonable inquiries" from either the chartering authority or the Superintendent. (§ 47604.3.) Additionally, the chartering authority can "inspect or observe any part of the charter school at any time" (§ 47607, subd. (a)) and charge the school for supervisorial oversight (§ 47613.7, subd. (a)).

### C. *Senate Bill No. 434*

Senate Bill No. 434 (1999-2000 Reg. Sess.) further refines the Charter Schools Act. Starting January 1, 2000, charter schools must (1) at a minimum, offer the same number of instructional minutes per grade level as required of all school districts (§ 47612.5, subd. (a)(1) [added by Stats. 1999, ch. 162, § 1]); and (2) maintain written contemporaneous records documenting pupil attendance and make the same available for audit and inspection (*id.,* subd. (a)(2)). As well, as a condition of apportionment of state funding, charter schools must certify that its pupils have participated in the state testing program in the same manner as all other pupils attending public schools. (*Id.,* subd. (a)(3).) Further, charter schools which provide independent study must comply with statutory requirements and implementing regulations that relate to independent study. (*Id.,* subd. (b).) And finally, in keeping with this sentiment, charter schools will be held to the same prohibition as local education agencies when it comes to extending funds or value to pupils in independent study programs (or their parents or guardians): They cannot claim state funding if the funds or other value so extended could not legally be extended to similarly situated pupils of a school district (or their parents or guardians). (§ 51747.3, subd. (a), as amended by Senate Bill No. 434 [Stats. 1999, ch. 162, § 2].)

## II. STANDARD OF REVIEW

Appellants have provoked a facial challenge to the Charter Schools Act and the Assembly Bill No. 544 amendments. This comes with a formidable burden commensurate with the outcome of a successful assault—namely, invalidation of a legislative act.

■ The California Constitution[7] is a limitation on the powers of the Legislature, and we construe such limits strictly. (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215].) Thus, when scrutinizing the constitutionality of a statute, we start with the premise of *validity*, resolving all doubts in favor of the Legislature's action. (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 260 [5 Cal.Rptr.2d 545, 825 P.2d 438].) This presumption of constitutionality is particularly appropriate where, as here, the Legislature has enacted a statute with the pertinent constitutional prescriptions in mind.[8] "In such a case, the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision." (*Pacific Legal Foundation v. Brown, supra*, 29 Cal.3d at p. 180.) Finally, to void a statute on its face, "petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*Id.* at pp. 180-181, italics omitted.)

## III. DISCUSSION

### A. The Legislature Has Plenary Power Over Public Schools

■ As a preamble to addressing the amalgam of constitutional objections laid out in this appeal, we emphasize that the Legislature's power over our public school system is plenary, subject only to constitutional restraints. (*Hall v. City of Taft* (1956) 47 Cal.2d 177, 180-181 [302 P.2d 574]; *California Teachers Assn. v. Hayes* (1992) 5 Cal.App.4th 1513, 1524 [7 Cal.Rptr.2d 699].) Since 1879 our Constitution has declared the Legislature's preeminent role in encouraging education in this state, as well as its fundamental obligation to establish a system of public schools: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." (Art. IX, § 1.) "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established." (*Id.*, § 5.)

There can thus be no doubt that our Constitution vests the Legislature with sweeping and comprehensive powers in relation to our public schools (*Hall*

---

[7]All references to constitutions and articles are to the California Constitution.

[8]Note, for example, that the Legislature has specifically found and declared that "Charter schools are part of the Public School System, as defined in Article IX" (§ 47615, subd. (a)(1)) and are "under the jurisdiction of the Public School System and the exclusive control of the officers of the public schools" (*id.*, subd. (a)(2)) "for purposes of Section 8 of Article IX . . . ." (§ 47612, subd. (b).)

v. *City of Taft, supra,* 47 Cal.2d at p. 179), including broad discretion to determine the types of programs and services which further the purposes of education (*California Teachers Assn.* v. *Hayes, supra,* 5 Cal.App.4th at p. 1528).

■■■ Appellants first maintain that the 1998 Assembly Bill No. 544 amendments violate article IX, section 5 because they amount to abdication of *any* state control over essential educational functions, e.g., control over curriculum, textbooks, educational focus, teaching methods and operations of charter schools. This is so, they argue, because the parents and teachers who write the charters and the grantees who operate the schools now run the show with respect to all these functions.

Appellants confuse the delegation of certain educational functions with the delegation of the public education system itself. As explained in *California Teachers Assn.* v. *Board of Trustees* (1978) 82 Cal.App.3d 249, 253-254 [146 Cal.Rptr. 850], the public school system is the system of schools, which the Constitution requires the Legislature to provide—namely kindergarten, elementary, secondary and technical schools, as well as state colleges—and the administrative agencies which maintain them. (See art. IX, § 6 [delineating features of public school system].) However, the curriculum and courses of study are not constitutionally prescribed. Rather, they are *details* left to the Legislature's discretion. Indeed, they do not constitute part of the system but are merely a function of it. (*California Teachers Assn.* v. *Board of Trustees, supra,* 82 Cal.App.3d at p. 255.) The same could be said for such functions as educational focus, teaching methods, school operations, furnishing of textbooks and the like.

Moreover, appellants take too myopic a view of what it means for the state to retain control of our public schools, including charter schools. The Charter Schools Act represents a valid exercise of legislative discretion aimed at furthering the purposes of education. Indeed, it bears underscoring that charter schools are *strictly* creatures of statute. From how charter schools come into being, to who attends and who can teach, to how they are governed and structured, to funding, accountability and evaluation—the Legislature has plotted all aspects of their existence. Having created the charter school approach, the Legislature can refine it and expand, reduce or abolish charter schools altogether. (See §§ 47602, subd. (a)(2), 47616.5.) In the meantime the Legislature retains ultimate responsibility for all aspects of education, including charter schools. ■■■ " 'Where the Legislature delegates the local functioning of the school system to local boards, districts or municipalities, it does so, always, with its constitutional power and responsibility for ultimate control for the common welfare in reserve.' " (*Phelps* v.

*Prussia* (1943) 60 Cal.App.2d 732, 738 [141 P.2d 440], quoting trial court decision.)

## B. *Charter Schools Are Part of California's Public School System*

 Appellants further complain that Assembly Bill No. 544 has spun off a separate system of charter public schools that has administrative and operational independence from the existing school district structure, and whose courses of instruction and textbooks may vary from those of noncharter schools. Such splintering, appellants charge, violates the article IX, section 5 mandate to the Legislature to provide a "system of common schools."

Article IX, section 6 defines "Public School System" as including "all kindergarten schools, elementary schools, secondary schools, technical schools, and state colleges, established in accordance with law and, in addition, the school districts and the other agencies authorized to maintain them."

The key terms in these provisions are "common" and "system." The concept of a "common" school is linked directly to that of a "free school," which the Constitution mandates must be "kept up and supported" in each district for a prescribed annual duration. (Art. IX, § 5.) Historically, common schools were the "primary and grammar" schools, distinguished from other instrumentalities of the public school system by virtue of being the exclusive beneficiaries of the state school fund. (*Los Angeles County* v. *Kirk* (1905) 148 Cal. 385, 390-391 [83 P. 250]; *Stockton School District* v. *Wright* (1901) 134 Cal. 64, 67 [66 P. 34]; Jones, *Chapters on the School Law of California* (1914) 2 Cal.L.Rev. 459, 460-461.)

As to the concept of a system, we note that early on in California history "the contest was between a state system and a local system of common schools." (*Mitchell* v. *Winnek* (1897) 117 Cal. 520, 526 [49 P. 579].) The notion of a single state system, under state control, prevailed. (See *id.* at pp. 523-526.) *Piper* v. *Big Pine School Dist.* (1924) 193 Cal. 664, 666 [226 P. 926] presents a variation on this theme: At that time, the federal government had established "a school for the education and training of members of the Indian race" within the territorial boundaries of Big Pine School District. Alice Piper, "a female Indian child," sought admission to school in that district. (*Id.* at p. 665.) Our Supreme Court agreed that she was entitled to admission, holding that eligibility to attend the federal school did not satisfy the mandate of article IX, section 5 because the state had no control over that school. (*Piper* v. *Big Pine School Dist., supra,* 193 Cal. at pp. 672-673.)

Thus the term "system" has come to import " 'unity of purpose as well as an entirety of operation, and the direction to the legislature to provide "a" system of common schools means *one* system which shall be applicable to all the common schools within the state.' " (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 595 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], original italics.) This means that the educational system must "be uniform in terms of the prescribed course of study and educational progression from grade to grade." (*Id.* at p. 596.)

From this perspective it is apparent that charter schools are part of California's single, statewide public school system. First, the Legislature has explicitly found that charter schools are (1) part of the article IX "Public School System"; (2) under its jurisdiction; and (3) entitled to full funding. (§ 47615, subd. (a).) These findings are entitled to deference. (*Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243, 1252 [48 Cal.Rptr.2d 12, 906 P.2d 1112].) As well, the Legislature has directed that the Charter Schools Act "shall be liberally construed to effectuate [these] findings . . . ." (§ 47615, subd. (b).)

Second, the establishment of charter schools does not create a dual system of public schools, as, for example, would be the case if there were a competing local system. Rather, while loosening the apron springs of bureaucracy, the Act places charter schools within the common system of public schools, as the following provisions illustrate: Charter schools by law are free, nonsectarian and open to all students. (§ 47605, subd. (d)(1).) They cannot discriminate against students on the basis of ethnicity, national origin, gender or disability. (*Ibid.*) Further, charter schools must meet statewide standards and conduct pupil assessments applicable to pupils in noncharter public schools (*id.*, subd. (c)(1));[9] must hire credentialed teachers (*id.*, subd. (*l*)); and are subject to state and local supervision and inspection

---

[9]Specifically, section 47605, subdivision (c)(1) states: "Charter schools shall meet all statewide standards and conduct the pupil assessments required pursuant to Section 60605 and any other statewide standards authorized in statute or pupil assessments applicable to pupils in noncharter public schools."

Section 60605, subdivision (a)(1)(A) directs the Board, according to various time frames, to "adopt statewide academically rigorous content standards . . . in the core curriculum areas of reading, writing, and mathmematics to serve as the basis for assessing the academic achievement of individual pupils and of schools, school districts, and the California education system." By November 1, 1998, the Board was to adopt content standards for history/social science and science. The adoption of statewide performance standards and pupil assessments in these areas follow on a later time frame. (*Id.*, subd. (a)(1)(B).)

Section 60605, subdivision (c)(1) and (2) calls on the Board to adopt an assessment instrument and to require each district to administer the statewide assessment to all pupils in specified grades and in specified subject areas.

It is highly significant to appellants' dual system argument that these very same academic content and performance standards adopted by the Board pursuant to section 60605 are model

(§§ 47605, subd. (k)(1), 47607, subd. (a)). Finally, beginning next year, charter schools must offer the minimum duration of instruction as required of all other public schools. (§ 47612.5, subd. (a)(1) [added by Stats. 1999, ch. 162, § 1].)

In sum it is clear that the Act brings charter schools within the system uniformity requirement because (1) their students will be taught by teachers meeting the same minimum requirements as all other public school teachers; (2) their education programs must be geared to meet the same state standards, including minimum duration of instruction, applicable to all public schools; and (3) student progress will be measured by the same assessments required of all public school students.

Moreover, the Act assures that charter schools will receive funding comparable to other public schools. (§§ 47612-47613.5.) In addition, it guards against the flow of funds to schools outside the system. For example, the Act prohibits the conversion of private schools to charter schools. It also bars charter schools from receiving any public funds for any pupil also attending a private school that charges the family for tuition. (§ 47602, subd. (b).)

C. *Charter Schools Are Under the Exclusive Control of Officers of the Public Schools and Fall Under the Jurisdiction of the Public School System*

■ Next, appellants contend that charter schools offend constitutional provisions calling for public schools to be under the exclusive control of officers of the public school system, as well as under the jurisdiction of that system. We find no problem.

1. *Article IX, Section 8*

Article IX, section 8 provides in part: "No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools . . . ."

This section endeavors to (1) prohibit the use of public funds to support private schools, whether sectarian or not; and (2) preserve strict separation

standards, which means that school districts may use them as a guideline in developing district standards. (See § 60618.) Thus, school districts have discretion when it comes to standards, just as charter schools do. All schools, however, must participate in the mandatory statewide assessments, which ensures a constitutional level of cohesion within the curriculum and course of study at each grade level in all schools. Section 47612.5, subdivision (a)(3) (added by Stats. 1999, ch. 162, § 1) conditions state funding on certification that charter school pupils participated in the state testing program in the same manner as all other public school students.

between religion and public education. Appellants attempt to build the argument that charter schools are private, not public schools. They are convinced that under Assembly Bill No. 544, officers of public schools have no real control over the educational product delivered by charter schools because these officers cannot deny a charter petition except upon finding that the educational program is unsound, the petitioners are "demonstrably unlikely" to succeed in implementing the program, or that the petition lacks certain mandatory items. (§ 47605, subd. (b).) According to appellants, this means the charter grantees are in control, and again according to appellants, they are not officers of the public schools.

First, the terms of Assembly Bill No. 544 belie these contentions. To begin with, charter schools *are* public schools because, as explained above, charter schools are part of the public school system.[10] (§ 47615, subd. (a)(1).) Further, the Legislature has specifically declared that charter schools are under "the exclusive control of the officers of the public schools" (*id.*, subd. (a)(2)) and directs us to construe the law liberally to effectuate that finding (*id.*, subd. (b)).

Second, one court construing the "exclusive control" language harkened back to early constitutional history, observing that "[t]he language of article IX, section 8, has remained unchanged since its proposal in the constitutional convention of 1878-1879 and its adoption by the People on May 7, 1879. It was approved at the convention without significant debate . . . . (See 3 Debates and Proceedings of the Constitutional Convention of the State of Cal. (1881).) . . . The delegates were seriously concerned with assuring that public funds should only be used for support of the public school system they were creating in article IX . . . . Thus, in another context a delegate expressed concern about any 'opposition system of schools against the common schools of the State . . . .' " (*Board of Trustees* v. *Cory* (1978) 79 Cal.App.3d 661, 665 [145 Cal.Rptr. 136].) Obviously charter schools are not in opposition to the public school system. On the contrary, they are a part of that system. Although they have operational independence, an overarching purpose of the charter school approach is to infuse the public school system with competition in order to stimulate continuous improvement in *all* its schools. (§ 47601, subd. (g).)

Third, we wonder what level of control could be more complete than where, as here, the very destiny of charter schools lies solely in the hands of public agencies and offices, from the local to the state level: school districts,

---

[10]Because charter schools are public schools and serve to further public education goals, contrary to appellants' additional assertion, their funding does not offend the public purpose doctrine. (See *City of Los Angeles* v. *Lewis* (1917) 175 Cal. 777, 779-780 [167 P. 390].)

county boards of education, the Superintendent and the Board. The chartering authority controls the application approval process, with sole power to issue charters. (See §§ 47605, 47605.5.) Approval is not automatic, but can be denied on several grounds, including presentation of an unsound educational program. (§ 47605, subd. (b)(1).) Chartering authorities have continuing oversight and monitoring powers, with (1) the ability to demand response to inquiries concerning financial and other matters (§ 47604.3);[11] (2) unlimited access to "inspect or observe any part of the charter school at any time" (§ 47607, subd. (a)(1)); and (3) the right to charge for actual costs of supervisorial oversight (§ 47613.7, subd. (a)). As well, chartering authorities can revoke a charter for, among other reasons, a material violation of the charter or violation of any law. (§ 47607, subd. (b)(1).) Short of revocation, they can demand that steps be taken to cure problems as they occur. (*Id.*, subd. (c).) The Board, upon recommendation from the Superintendent, can also revoke any charter or take other action in the face of certain grave breaches of financial, fiduciary or educational responsibilities. (§ 47604.5.) Additionally, the Board exercises continuous control over charter schools through its authority to promulgate implementing regulations. (§§ 47605, subd. (j)(4), 47613.5, subd. (b).) Finally, public funding of charter schools rests in the hands of the Superintendent. (See §§ 47612, 47613.)

Fourth, the sum of these features, which we conclude add up to the requisite constitutional control over charter schools, are in place whether a school elects to "operate as, or be operated by, a nonprofit public benefit corporation" (§ 47604, subd. (a)), or whether it remains strictly under the legal umbrella of the chartering authority. In other words, even a school operated by a nonprofit could never stray from under the wings of the chartering authority, the Board, and the Superintendent. We note too that situating the locus of control with the public school system rather than the nonprofit is not incompatible with the laws governing nonprofit public benefit corporations. Specifically, one of their enumerated powers is to "[p]articipate with others in any partnership, joint venture or other association, transaction or arrangement of any kind *whether or not such participation involves sharing or delegation of control with or to others.*" (Corp. Code, § 5140, subd. (j), italics added.)

Fifth, speaking directly to appellants' repeated concern that charter grantees will be making decisions about curriculum and similar educational functions and thus the necessary control element has been abandoned, we reiterate that these functions are details left to legislative discretion. (*California Teachers Assn.* v. *Board of Trustees, supra,* 82 Cal.App.3d at p. 255.) With the Charter Schools Act, the Legislature has exercised its discretion to

---

[11]The Superintendent can likewise prompt inquiry. (§ 47604.3.)

sanction a certain degree of flexibility and operational independence, thereby giving the nod to healthy, innovative practices and experimentation. Central to its intent is the goal of stimulating continuous improvement in *all* public schools by fostering competition within the public school system itself. (See § 47601, subd. (g).) And in any event, through their powers to deny petitions and revoke charters, chartering authorities *do* exercise control over these educational functions.

Sixth, as to appellants' point that charter grantees are not officers of public schools, the law again belies this proposition. The Constitution gives the Legislature the "power, by general law, to provide for the incorporation and organization of school districts . . . of every kind and class, and [to] classify such districts." (Art. IX, § 14.) Seizing this power, the Legislature has declared that "[a] charter school shall be deemed to be a 'school district' for purposes of Section 41302.5 and Sections 8 and 8.5 of Article XVI . . . ."[12] (§ 47612, subd. (c).) Appellants argue that a charter school is not a school district "because its incorporation and organization [have] not been provided by an enactment of the Legislature . . . ." What is the Charter Schools Act if not an enactment of the Legislature providing for the organization of charter schools as districts for purposes of the enumerated provisions? Nothing in article IX, section 6 says that a district *classified* by the Legislature must also be *incorporated* pursuant to explicit legislative direction.

Thus, under this scheme, charter school officials are officers of public schools to the same extent as members of other boards of education of public school districts. So long as they administer charter schools according to the law and their charters, as they are presumed to do, they stand on the same constitutional footing as noncharter school board members. If they violate the law, the charter will be revoked.

## 2. *Article IX, Section 6*

Appellants advance similar arguments concerning the jurisdictional requirement of article IX, section 6. This section reads in part: "No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System *or placed under the*

---

[12]Article XVI, section 8 gives priority funding status to support of the public school system and public institutions of higher education and also sets minimum amounts of funding. Section 8.5 of article XVI provides for allocation of property tax revenues to public schools. Section 41302.5 states that for purposes of these two constitutional sections, the term " 'school districts' shall include county boards of education, county superintendents of schools, and direct elementary and secondary level instructional services provided by the state . . . ."

*jurisdiction of any authority other than one included within the Public School System.*" (Italics added.) Article IX, section 6 also provides that the public school system consists of the various levels and types of public schools and colleges as well as "the school districts and the other agencies authorized to maintain them."

School districts, county boards of education and respondent Board share several things in common: The formation of each entity is provided for in article IX (§ 7 [Board and county boards of education], §§ 14 & 16 [local school districts and their governing boards]). As such each entity is "authorized to maintain" the various schools in our public school system. (*Id.*, § 6.) Finally, each entity is a defined chartering and revoking authority under the Act (§§ 47605, subds. (b), (j), 47605.5, 47607), with supervisorial oversight over their charter schools (§§ 47604.3, 47607, 47613.7). The most direct answer to appellants' jurisdictional challenge is this: Charter schools are under the jurisdiction of chartering authorities; chartering authorities are authorities "within the Public School System," and hence no violation of article IX, section 6 can be stated.

To the extent appellants define the term "jurisdiction" more narrowly as "management and control" (citing *California Teachers Assn. v. Board of Trustees, supra,* 82 Cal.App.3d at p. 256), our analysis of article IX, section 8 fully applies. (See pt. C.1., *ante.*)

### D. *The Charter Schools Act As Amended Does Not Run Afoul of Constitutional Prohibitions Against Public Appropriations in Aid of Sectarian Purposes or Institutions*

■ Appellants' greatest misgiving is their assessment that the current scheme "requires the issuance of a school charter to every church or sect who otherwise qualifies to be a charter grantee . . . ." (Underscore omitted.) They reason as follows: A chartering authority cannot deny a charter, whether the proposed grantee is sectarian or not, unless it can render one of the negative findings set forth in section 47605, subdivision (b). This is so because the statute does not explicitly authorize chartering authorities to deny a petition on grounds that petitioner is a religious organization or an affiliate of a religious organization.

Moreover, appellants are dismayed that the Act does not specifically sanction charter revocation in the event a school is or becomes controlled by

a religious sect.[13] Accordingly, they are adamant that churches and other sectarian groups will and must be permitted to operate and control charter schools, all in defiance of article XVI, section 5[14] and article IX, section 8 (quoted in pertinent part in pt. C.1., *ante*).

The antidote to these concerns is found in the Act itself. Charter petitioners must affirm that their school will be nonsectarian in its programs and operations. (§ 47605, subds. (b)(4), (d)(1).) A petition lacking such affirmation can be denied. (*Id.*, subd. (b)(4).) But what if the petition contained the requisite affirmation but petitioners nonetheless were controlled by a religious organization? In that event, the chartering authority could deny the petition because petitioners were "demonstrably unlikely to successfully implement the program set forth in the petition," most notably its nonsectarian premise. (*Id.*, subd. (b)(2).) Moreover, a petition for a charter school controlled by a sectarian organization would be denied under this same clause because the school would be *illegal* under article XVI, section 5. A school illegal from its inception has little chance of success.

---

[13]To demonstrate their concern, appellants refer us to the discussion in the Little Hoover Report about an independent study, home-based charter school where, "[a]t the request of parents, the school was purchasing textbooks published by organizations with religious affiliations." (Little Hoover Rep., *supra*, at p. 57.) Appellants are appalled that the school's charter was not revoked. This is not the whole story. According to the report, the school changed its policy after the county education office informally told school officials "that such purchases could be viewed as violating the anti-sectarian provisions of the charter law." (*Ibid.*)

On a related note, appellants also cite the existence of 40 home-based charter schools, assuming, without factual basis, that "[b]y definition, the home-based teacher is a good Christian, Jew, Muslim, Buddhist, or what have you, who inculcates the parents' religion to the pupil, in the course of the home-based teaching." This is a speculative attack on home-based independent study programs in general, which exist *apart* from the charter school movement. While the Little Hoover Report gives some credence to concerns about funnelling public funds to parents to subsidize religious training, it also notes: "Unfortunately, [this concern is] just as possible in independent study programs that are not run by charter schools, Department of Education officials acknowledge. [¶] The department points out that there is no special program with earmarked funding; independent study is a teaching 'modality' rather than a specific program. A district that chooses to have such a program receives per-pupil funding equal to that it receives for a student who it houses in a classroom under full-time teacher supervision." (Little Hoover Rep., *supra*, at p. 58.) And in any event, starting next year charter schools will be explicitly barred from receiving state funds if they pay for religious materials or anything else in connection with a home or independent study program that could not legally be purchased for the education of noncharter public school students. (See § 51747.3, subd. (a).)

[14]Article XVI, section 5 reads in relevant part: "Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever . . . ."

In addition, if a school's religious affiliation evolved *after* charter status was attained, or, if initially masked, became revealed at such later time, either situation would be immediate grounds for charter revocation. In the first instance, the school would come within the "[v]iolated any provision of law" provision of section 47607, subdivision (b)(4). In the latter instance, petitioners would have presented a facially acceptable but misleading petition, i.e., one affirming that the school would be nonsectarian in its programs and operations. (§ 47605, subds. (b)(4), (d)(1).) When that proved not to be the case, the charter would be subject to revocation because the school materially violated its charter. (§ 47607, subd. (b)(1).)

Appellants' various legal arguments are not persuasive. First, they dissect the holding of *California Teachers Assn. v. Riles* (1981) 29 Cal.3d 794 [176 Cal.Rptr. 300, 632 P.2d 953], a case that has no applicability to the one at hand. *Riles* involved a constitutional challenge to the statutory textbook loan program, which authorized the lending of public school textbooks to students attending private schools. There was no question that sectarian schools would benefit from the program. The only question was the *character* of the benefit provided, the state defendants arguing an indirect benefit under the "child benefit" doctrine. The high court rejected their arguments, holding that the benefit to sectarian schools themselves was neither indirect nor remote. By providing textbooks at public expense the loan program appropriated money to advance the educational function of sectarian schools, in violation of section 8 of article IX and section 5 of article XVI. (*California Teachers Assn. v. Riles, supra*, 29 Cal.3d at pp. 809-813.)

In contrast, charter schools must be nonsectarian. Not content with the nonsectarian provisions of the Charter Schools Act, appellants claim the law is flawed because it does not include an express nonaffiliation provision, as do the Minnesota and federal charter school laws.[15] Their theory is untenable: that section 47605, subdivision (d), as worded, authorizes "public charter schools to be owned by, controlled by, affiliated with,[16] or operated by, a church or religious group, provided, that it be nonsectarian in its programs, admission policies, employment practices, and all other operations."

---

[15]Section 124D.10, subdivision 8(c) of the Minnesota State Laws provides in part that the sponsor of a charter school *"may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or a religious institution."* (Italics added.) The federal act similarly provides in part that a charter school is a public school which, among other traits, *"is not affiliated with a sectarian school or religious institution . . . ."* (20 U.S.C. § 8066(1)(E), italics added.)

[16]Appellants do not explain the concept of "affiliation" nor does that term or concept appear in the relevant constitutional provisions. The verb "affiliate" means "to bring or receive into close connection as a member or branch[;] to associate as a member." (Webster's New Collegiate Dict. (9th ed. 1984) p. 61, col. 2.) Common sense tells us that for purposes of article XVI, section 5, a school that associated itself as a member or branch of a religious sect

This construction disregards settled principles of statutory construction, such as: We presume that the Legislature operates within the borders of the Constitution when enacting legislation. (*In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142].)[17] Unless a conflict with a provision of the Constitution is clear and unquestionable, we will uphold the statute, wherever possible interpreting it as consistent with applicable constitutional provisions, seeking to harmonize statute and Constitution. (*Arcadia Unified School Dist.* v. *State Dept. of Education, supra,* 2 Cal.4th at p. 260.) Finally, there is no requirement that the Legislature bar by statute what is already barred by Constitution. (See *Bowen* v. *Kendrick* (1988) 487 U.S. 589, 614 [108 S.Ct. 2562, 2577, 101 L.Ed.2d 520].) In this sense, a nonaffiliation provision would be redundant because nonaffiliation is already constitutionally proscribed.

E. *The Charter Schools Act Does Not Conflict With the Textbook Adoption Requirement of Article IX, Section 7.5*

■ The broad exemption from most education laws governing school districts, which the Act extends to charter schools, embraces section 60200 concerning adoption of textbooks by the Board. Article IX, section 7.5 calls for such adoption: "The [Board] shall adopt textbooks for use in grades one through eight throughout the State, to be furnished without cost as provided by statute."

From this appellants posit infringement of article IX, section 7.5. But how? By its terms the provision imposes a requirement *on the Board.* It does not constitute a limitation on school districts, prohibit them from choosing other books,[18] or hinder the Legislature from enacting laws delineating the scope of the Board's authority (see *Engelmann* v. *State Bd. of Education, supra,* 2 Cal.App.4th at p. 54). "[T]he Legislature may define, limit, or condition a constitutional power or right so long as it does not unduly burden

---

would, in fact, be controlled by the operative "religious creed, church, or sectarian denomination."

[17]One strong indicator of validity is this: With Assembly Bill No. 544 the Legislature has permitted charter schools to elect to operate as, or be operated by, a nonprofit public benefit corporation. (§ 47604, subd. (a).) It is significant that the statute does not, for example, refer more broadly to corporations organized under the Nonprofit Corporation Law. (See Corp. Code, § 5000 et seq.) In addition to nonprofit public benefit corporations, such corporations would include nonprofit *religious* corporations. (See *id.,* § 5046.) Thus, the *only* private entity that can operate a charter school is a nonprofit public benefit corporation. A church or other religious corporation could never operate a charter school outright.

[18]Under the code itself a school district can select nonadopted textbooks, but only if it establishes to the Board's satisfaction "that the state-adopted instructional materials do not promote the maximum efficiency of pupil learning in the district . . . ." (§ 60200, subd. (g); *Engelmann* v. *State Bd. of Education* (1991) 2 Cal.App.4th 47, 52 [3 Cal.Rptr.2d 264].)

the exercise of that power or right." (*Ibid.*) This is just what section 47610 does: By exempting charter schools from the textbook adoption (and numerous other) laws, the Legislature has limited the scope of the Board's authority with respect to the textbook selection process. However, the price for limited experimentation and operational freedom afforded to charter schools does not unduly burden the Board's exercise of its textbook selection powers. Therefore, the Act does not run afoul of article IX, section 7.5.

F. *The Act Does Not Impermissibly Delegate Legislative Powers*

■ Appellants' final protest concerns the effect of the unamended Charter Schools Act, should we strike Assembly Bill No. 544. They insist that the underlying enactment amounts to an unconstitutional delegation of legislative powers to the Board and other chartering authorities. Specifically, they assert that the power to issue charters has been handed over without standards or guidance as to a whole quilt of concerns: decisions about curriculum, texts, educational focus, and teaching methods; minimum qualifications of charter grantees; whether, through apt terms in the charter, to retain control over public educational functions of the charter schools; and whether to grant charters to grantees controlled by a church or religious sect. Appellants cast each of these issues as implicating "a fundamental policy decision which the Legislature [is] required to make . . . ."

To begin with, the Legislature has not left it up to charter authorities to decide whether to grant a charter to a grantee controlled by a religious sect. To reiterate: Article XVI, section 5 *is* the standard, and the standard is "don't do it under any circumstances."

Next, appellants misunderstand the legislative function. ■ "Essentials of the legislative function include the determination and formulation of legislative policy. 'Generally speaking, attainment of the ends, including how and by what means they are to be achieved, may constitutionally be left in the hands of others. The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the "power to fill up the details" by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect . . . .' " (*State Bd. of Education* v. *Honig* (1993) 13 Cal.App.4th 720, 750 [16 Cal.Rptr.2d 727], quoting *First Industrial Loan Co.* v. *Daugherty* (1945) 26 Cal.2d 545, 549 [159 P.2d 921].)

■ Here, the Legislature made the fundamental policy decision to give parents, teachers and community members the opportunity to set up public schools with operational independence in order to improve student learning,

promote educational innovation and accomplish related public education goals. (§ 47601.) From there, the Legislature set limits on the number of charter schools that can exist at any particular time and their term (§§ 47602, subd. (a), 47606, subd. (a)); controlled against charter status by way of private school conversion (§ 47602, subd. (b)); and fixed standards for charter schools, as detailed in the numerous petition and operational requirements set forth in section 47605. Having set the policy and fixed standards and limits, the Legislature did its job: "In the educational setting, legislatures rarely control public school operations directly, but delegate authority which permits state, regional, and local education agencies to establish school policies and practices." (*State Bd. of Education* v. *Honig, supra*, 13 Cal.App.4th at p. 750.)

Reasonable grants of power to administrative agencies will not offend the nondelegation doctrine so long as adequate safeguards exist to protect against abuse of that power. (*State Bd. of Education* v. *Honig, supra*, 13 Cal.App.4th at p. 751.) Here, procedures are in place to safeguard the chartering authority decisionmaking process. These include procedures for review of denied petitions (§ 47605, subd. (j)) and, with the Assembly Bill No. 544 amendments, open meeting requirements (§ 47608).

Finally, while it is obvious that appellants wish for more—and more detailed—standards and guidelines, more could not be better in this situation where a primary purpose of the Act is to encourage educational innovation, experimentation and choice in order to improve learning and expand learning opportunities for all students. How can you write the score to a symphony yet to be created?

## IV. DISPOSITION

The Charter Schools Act rests on solid constitutional ground. We affirm the judgment.

Hanlon, P. J., and Poché, J., concurred.

A petition for a rehearing was denied November 24, 1999, and appellants' petition for review by the Supreme Court was denied January 25, 2000.