10 Cal.Rptr.3d 456 (2004)
116 Cal.App.4th 402
Joey WELLS, a Minor, etc., et al., Plaintiffs and Appellants,
v.
ONE2ONE LEARNING FOUNDATION et al., Defendants and Respondents;
State of California, Real Party in Interest and Respondent.
No. C042504.
Court of Appeal, Third District.
March 3, 2004.
Rehearing Denied March 23, 2004.
Review Granted June 23, 2004.
*459 Law Offices of Michael S. Sorgen, Michael S. Sorgen, San Francisco, Claudia A. Baldwin, Oakland,; Haley and Bilheimer, Allan Haley, John Bilheimer, Neveda City, for Plaintiff and Appellant.
Gordon & Rees, Dion N. Cominos, Mark C. Russell, San Francisco, for Defendant and Respondent One2One Learning Foundation.
Seyfarth Shaw, James M. Nelson, Kurt A. Kappes, Sacramento, William S. Jue for Defendant and Respondent Charter School Resource Alliance.
California Education Legal Services, Thomas M. Griffin, David E. Robinett for Defendant and Respondent Camptonville Elementary School District.
Parks, Dingwall & Associates, Linda Rhoads Parks, Walnut Creek; Law Offices of Jon Webster and Jon Webster, Concord, for Defendant and Respondent Camptonville Academy, Inc.
Needham, Davis, Kirwan & Young, Mark E. Davis, Marc J. Cardinal for Defendant and Respondent Mattole Unified School District.
Duncan, Ball & Evans, Mathew D. Evans, Sacramento, James B. Carr for Defendants and Respondents Sierra Summit Academy, Inc., and Sierra Plumas Joint Unified School District.
Bill Lockyer, Attorney General, Christopher Ames, Senior Assistant Attorney General, Larry G. Raskin, Supervising Deputy Attorney General, Mark R. Soble, Deputy Attorney General for Real Party in Interest.
ROBIE, J.
How to properly educate our children in the public schools is a complex question with no simple answer. Ultimately, the *460 resolution of this question is for the parents of those children, their teachers, their school boards, and the Legislature, not the courts. (See Peter W. v. San Francisco Unified Sch. Dist. (1976) 60 Cal.App.3d 814, 824-825, 131 Cal.Rptr. 854 (Peter W.).)
One way our Legislature has chosen to address concerns over the public education of our children is to enact the Charter Schools Act of 1992.[1] (Ed.Code,[2] § 47600 et seq.) The Charter Schools Act allows "teachers, parents, pupils, and community members to establish and maintain schools that operate independently from the existing school district structure." (§ 47601.) By enacting this statute, the Legislature hoped to improve pupil learning, increase learning opportunities, encourage innovation in our public schools, create professional opportunities for teachers, provide expanded choices of educational opportunities, hold schools accountable for their performance, and "[p]rovide vigorous competition within the public school system." (§ 47601.)
In this opinion, we hold charter school students and their parents may not sue their public charter schools for violation of Business and Professions Code section 17200 et seq., misrepresentation, or breach of contract based on allegations that their charter schools failed to deliver a proper public education.
The Charter Schools Act, however, is not a license for a charter school to fraudulently obtain state funds free from judicial review. Thus, we conclude the plaintiffs here have stated a cause of action under the California False Claims Act[3] against several charter schools and their chartering school districts based on the allegation those schools "request[ed] funding from ... the STATE OF CALIFORNIA, knowing that their ADA [average daily attendance] records did not accurately reflect the students enrolled in and receiving instruction, educational materials, or services from their schools."
Accordingly, we shall reverse the judgment in favor of defendants and remand the matter for further proceedings on the False Claims Act cause of action.

FACTUAL AND PROCEDURAL BACKGROUND
Plaintiff Joey Wells and the other child plaintiffs enrolled in three different California charter schools  Sierra Summit Academy, Inc., Mattole Valley Charter School, and the Camptonville Academy (collectively the charter schools). The charters for these schools were approved, respectively, by defendants Sierra Plumas Joint Unified School District (Sierra Plumas JUSD), Mattole Unified School District (Mattole USD) and Camptonville Unified Elementary School District (Camptonville UESD). Plaintiffs allege the charter schools are under the control of defendants One2One Learning Foundation and its alleged alter ego Charter School Resource Alliance.
The plaintiff school children and their parents (collectively Wells) sued the charter schools, the operators of these schools, and the school districts that authorized their charters. Wells sought damages, equitable relief, and declaratory relief, asserting causes of action for: (1) violation of the False Claims Act; (2) violation of Business and Professions Code section 17200 et seq.; (3) intentional misrepresentation; (4) *461 negligent misrepresentation; and (5) breach of contract.[4] Wells also alleged this was a class action lawsuit filed on behalf of all similarly situated students and parents.
At the core of this lawsuit, Wells alleges defendants "engage[] in a practice of defrauding parents, school districts, and the State by collecting more than $20 million annually in educational funds to run charter schools without providing instruction and educational materials for which the funds were intended, and by overcharging for its services."
More specifically, Wells alleges defendant One2One[5] and Charter School Resource Alliance operate the charter schools as "distance learning schools." In a "distance learning school," the students study at home and lessons are typically completed by computer and sent to the school via the Internet. Students are also tested in this manner. Wells alleges the charter schools' method of providing education includes providing students with a computer, educational software, textbooks, and reimbursement for money spent on educational materials. Charter school funding is based upon the average daily attendance or ADA of the pupils who attend the schools. The manner in which it is calculated is provided for in sections 46300 and 46301. Charter schools receive their funding from the state based upon their ADA. (§ 47633.)
Wells alleges the charter schools use "educational facilitators" (who may or may not be credentialed teachers) to administer their programs. Wells alleges the charter schools and the educational facilitators made a number of promises to the children and their parents about delivering at-home education to their children but failed to provide instructors, computers, and educational materials.
For example, plaintiff Joey Wells enrolled at Sierra Summit Academy from October 1998 to June 1999. Joey Wells's educational facilitator promised him and his parents a computer, textbooks, on-line tests, reimbursement for sports team involvement, and part-time instruction. According to Wells, Sierra Summit Academy never delivered a computer or textbooks. The only thing the educational facilitator did for him was to provide computer software that was available free on the Internet and to come by regularly to obtain Wells's parents' signatures on school attendance records. Wells alleges his father provided all of Joey Wells's education at his own expense. Although Joey Wells had not received a computer, textbooks, software, instruction and his father spent the year home schooling his son, Sierra Summit Academy collected the state ADA-based money for his "schooling."
Plaintiffs Katie, Karen, and Joey Pell also enrolled at Sierra Summit Academy from June to September 1998. Plaintiff Merlyn Adams enrolled in the Mattole Valley Charter School from August to October 1999. Plaintiffs Chris, Audrey, and David Crescenti enrolled in the Camptonville Academy from August through December 1999. Their stories were similar to that of Joey Wells.
Wells alleges the school districts turn a blind eye to the charter schools' abuses of the system because they are poor rural districts that need the money. Wells alleges the school districts receive significantly *462 more of the state ADA payment for the students than the Charter School Act allows. Wells alleges the school district defendants have failed to properly monitor the charter schools.
Pursuant to the requirements of the False Claims Act, Wells filed the complaint under seal. Upon the Attorney General's request, the complaint was unsealed. Several of the defendants filed three separate demurrers to the first amended complaint.
After hearing, the trial court concluded the charter schools were public entities. The trial court further concluded the gravamen of each of the causes of action at issue here was a challenge to the quality of the education the plaintiff children received from these public schools. Based upon the rule that bars claims for educational malfeasance against public schools (Peter W., supra, 60 Cal.App.3d 814, 131 Cal.Rptr. 854), the court concluded each of Wells's causes of action at issue here was barred and sustained defendants' demurrers to these causes of action without leave to amend. The trial court also sustained defendants' demurrers to these causes of action without leave to amend based on other theories and with leave to amend based upon the failure of Wells to properly plead compliance with the California Tort Claims Act.[6] Wells appeals.[7]

DISCUSSION

I

Standard of Review
"A demurrer tests the legal sufficiency of the complaint, and the granting of leave to amend involves the trial court's discretion. Therefore, an appellate court employs two separate standards of review on appeal. [Citations.] First, the complaint is reviewed de novo to determine whether it contains sufficient facts to state a cause of action. [Citation.] In doing so, we accept as true the properly pleaded material factual allegations of the complaint, together with facts that may be properly judicially noticed. Reversible error exists only if facts were alleged showing entitlement to relief under any possible legal theory. [Citations.]" (Hernandez v. City of Pomona (1996) 49 Cal.App.4th 1492, 1497, 57 Cal.Rptr.2d 406.)
"Second, where the demurrer is sustained without leave to amend, reviewing courts determine whether the trial court abused its discretion in doing so. [Citations.] On review of the trial court's refusal to grant leave to amend, we will only reverse for abuse of discretion if we determine there is a reasonable possibility the pleading can be cured by amendment. Otherwise, the trial court's decision will be affirmed for lack of abuse." (Hernandez v. City of Pomona, supra, 49 Cal.App.4th at pp. 1497-1498, 57 Cal.Rptr.2d 406.)

II

Business and Professions Code Section 17200 et seq.

The Unfair Competition Law (UCL)
Wells argues the trial court erred in dismissing his cause of action under the UCL. We disagree.

A

The UCL does not Apply to Public Entities
The trial court sustained defendants' demurrers to Wells's UCL cause of action *463 based on the conclusion defendants were all public entities and thus exempt from the UCL. We conclude the trial court did not err.
Business and Professions Code section 17203 provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Civil penalties may also be imposed on "[a]ny person who engages, has engaged, or proposes to engage in unfair competition." (Bus. & Prof.Code, § 17206.)
Business and Professions Code section 17201 provides the term "person" "shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."
In Community Memorial Hospital v. County of Ventura (1996) 50 Cal.App.4th 199, 208, 56 Cal.Rptr.2d 732, Division Six of the Second District Court of Appeal concluded a county was not a person within this definition and thus the UCL did not apply to the county. The court started with the proposition that the term "county" was not listed within the express words of the statute. (Id. at p. 209, 56 Cal.Rptr.2d 732.) Further, the court noted a county "is neither a person, nor a corporation, nor a municipal corporation; it is a subdivision of the state." (Ibid.) The court explained, "`[I]n the absence of express words to the contrary, neither the state nor its subdivisions are included within the general words of a statute. [Citations.] But this rule excludes governmental agencies from the operation of general statutory provisions only if their inclusion would result in an infringement upon sovereign governmental powers. "Where ... no impairment of sovereign powers would result, the reason underlying this rule of construction ceases to exist and the Legislature may properly be held to have intended that the statute apply to governmental bodies even though it used general statutory language only." [Citations.]' [Citations.]." (Id. at p. 210, 56 Cal.Rptr.2d 732.) The court concluded, "There can be no dispute that guarding the public health is within the County's sovereign powers. The operation of a public hospital, even one that accepts paying patients, is simply a means of implementing that power. Thus, inclusion of the County in the [UCL] as it relates to the operation of its hospital would result in an infringement on its sovereign powers." (Ibid.)
In Trinkle v. California State Lottery (1999) 71 Cal.App.4th 1198, 1204, 84 Cal.Rptr.2d 496, we concluded the State Lottery Commission was not a person for purposes of the UCL. We noted, "Nowhere in the [UCL] is there a provision imposing governmental liability for violations of the act. Because there is no statute making public entities liable under the [UCL], the general rule of governmental immunity must prevail." (Id. at p. 1202, 84 Cal.Rptr.2d 496.)
Other courts have similarly concluded public entities are not persons for purposes of the UCL. (California Medical Assn. v. Regents of University of California (2000) 79 Cal.App.4th 542, 551, 94 Cal.Rptr.2d 194 [University of California at Los Angeles]; Janis v. California State Lottery Com. (1998) 68 Cal.App.4th 824, 831, 80 Cal.Rptr.2d 549 [State Lottery Commission]; Santa Monica Rent Control Bd. v. Bluvshtein (1991) 230 Cal.App.3d 308, 318, 281 Cal.Rptr. 298 [city-chartered rent control board].)
In light of the purposes underlying the UCL, we conclude these courts correctly decided governmental agencies are not subject to that statutory scheme. The UCL is designed to preserve fair competition among business competitors and protect *464 the public from nefarious and unscrupulous business practices. (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527.) The government is not in business. Thus, logically, it is not a person for purposes of the UCL.
The rationale of these cases applies to causes of action against our public schools. Schools and school districts are not listed in the UCL's list of entities that are "persons" and subject to that statutory scheme. Just as guarding the public health is an inherent part of the sovereign's power (Community Memorial Hospital v. County of Ventura, supra, 50 Cal.App.4th at p. 210, 56 Cal.Rptr.2d 732), so too is providing for the education of our children. (Kirchmann v. Lake Elsinore Unified School Dist. (2000) 83 Cal.App.4th 1098, 1115, 100 Cal.Rptr.2d 289.) Thus, public schools and public school districts are exempt from the UCL.

B

The Defendants are Public Entities
The conclusion that public schools and public school districts are not "persons" for purposes of the UCL takes us to the next question. Are charter schools and their operators public entities and, therefore, likewise not "persons" under the UCL? Like the trial court, we conclude they are.
"`Charter schools are grounded in private-sector concepts such as competition-driven improvement ..., employee empowerment and customer focus. But they remain very much a public-sector creature, with in-bred requirements of accountability and broad-based equity. Simple in theory, complex in practice, charter schools promise academic results in return for freedom from bureaucracy.'" (Wilson v. State Bd. of Education (1999) 75 Cal.App.4th 1125, 1129, 89 Cal.Rptr.2d 745 (Wilson).)
The enabling legislation for charter schools evidences the Legislature's intent that charter schools are part of the public school system, and hence public entities. In its list of the goals for the charter school system, the Legislature stated charter schools would "[p]rovide vigorous competition within the public school system to stimulate continual improvements in all public schools." (§ 47601, subd. (g), italics added.)
Moreover, from cradle to grave, charter schools derive their existence, operating restrictions, and funding from the public entities charged with the education of our children. Initially, charter schools are formed by the approval of a petition submitted to the governing board of the local school district, a county board of education, or the State Board of Education. (§§ 47605, 47605.5, 47605.6 & 47605.8.) These authorities may grant the school an initial charter for a period of not more than five years. (§ 47607.) Further, these public entities may renew the charter for additional five-year periods. (§ 47607.)
As far as their daily operations are concerned, charter schools may "elect to operate as, or be operated by, a nonprofit public benefit corporation, formed and organized pursuant to the Nonprofit Public Benefit Corporation Law." (§ 47604, subd. (a).) For any charter school that elects to operate in this manner, the "governing board of a school district that grants a charter ... shall be entitled to a single representative on the board of directors of the nonprofit public benefit corporation." (§ 47604, subd. (b).)[8]
*465 We reject Wells's contention that charter schools are not public entities because they are not subject to public oversight or accountable to the public school boards or the State Department of Education. Once a charter is granted, it may be revoked by the authorizing agency or the State Board of Education for a number of reasons, including: (a) violations of the conditions, standards, or procedures in the charter; (b) failure to meet or pursue any of the pupil outcomes in the charter; (c) failure to meet generally accepted accounting principles; (d) fiscal mismanagement; or (e) violation of any provision of law, which obviously includes all of the provisions of the Charter Schools Act. (§§ 47607, 47604.5.)
Importantly, charter schools are required to promptly respond to all reasonable inquiries of their chartering authority, the county office of education, or the state superintendent of public instruction and to consult with them concerning these inquiries. (§ 47604.3.) Charter schools are specifically required to respond to inquiries from these public entities regarding their financial records. (Ibid.) Upon the written complaints of parents, or other information that justifies an investigation, the county superintendent of schools may investigate a charter school. (§ 47604.4.)
To effectuate the public funding for charter schools, the Legislature provided, "[a] charter school shall be deemed to be under the exclusive control of the officers of the public schools for purposes of Section 8 of Article IX of the California Constitution, with regard to the appropriation of public moneys to be apportioned to any charter school, including, but not limited to, appropriations made for the purposes of this chapter." (§ 47612, subd. (a).) Further, the Legislature declared, "[a] charter school shall be deemed to be a `school district' for purposes of Article 1 (commencing with Section 14000) of Chapter 1 of Part 9, Section 41301, Section 41302.5, Article 10 (commencing with Section 41850) of Chapter 5 of Part 24, Section 47638, and Sections 8 and 8.5 of Article XVI of the California Constitution." (§ 47612, subd. (c).)
If the public attributes of their funding and oversight were not enough, the Legislature explicitly stated, "(1) Charter schools are part of the Public School System, as defined in Article IX of the California Constitution. [¶] (2) Charter schools are under the jurisdiction of the Public School System and the exclusive control of the officers of the public schools, as provided in this part." (§ 47615, subd. (a).)
These statutory provisions establish the Legislature created a public entity educational alternative to the existing public schools.
Wilson, supra, 75 Cal.App.4th 1125, 89 Cal.Rptr.2d 745, further supports this conclusion. In a facial challenge to the Charter Schools Act, the plaintiffs argued the Charter Schools Act "spun off a separate system of charter public schools that has administrative and operational independence from the existing school district structure." (Id. at p. 1136, 89 Cal.Rptr.2d 745.) They also argued the Charter Schools Act violated the "constitutional provisions calling for public schools to be under the exclusive control of officers of the public school system, as well as under *466 the jurisdiction of that system." (Id. at p. 1138, 89 Cal.Rptr.2d 745.)
Division Four of the First District Court of Appeal rejected these challenges and concluded charter schools are part of the public school system under that school system's jurisdiction. (Wilson, supra, 75 Cal.App.4th at pp. 1136-1141, 89 Cal.Rptr.2d 745.) In holding the charter schools were part of the system of common schools provided for in the California Constitution, the appellate court drew on the statutory language we have cited above which designates that charter schools are part of the public school system, under its jurisdiction, and entitled to full public funding. (Id. at pp. 1136-1137, 89 Cal.Rptr.2d 745.) The court also concluded charter schools are part of this single public school system because they are free, nonsectarian, open to all students, and may not discriminate based on ethnicity, national origin, gender, or disability. (Ibid.) While free of some of the bureaucratic apron strings of other public schools, charter schools must meet statewide standards and conduct pupil assessments applicable to pupils in public schools, must hire credentialed teachers, and are subject to state and local supervision and inspection. (Id. at pp. 1137-1138, 89 Cal.Rptr.2d 745.) The court concluded that "charter schools are public schools because, as explained above, charter schools are part of the public school system." (Id. at p. 1139, 89 Cal.Rptr.2d 745.)
We find further support for the conclusion charter schools and their operators are public entities in the Tort Claims Act definition of public entities. Under Government Code section 811.2, public entities are defined to "include[ ] the State, the Regents of the University of California, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State." School districts are public entities under this definition. (Wright v. Compton Unified Sch. Dist. (1975) 46 Cal.App.3d 177, 181-182, 120 Cal.Rptr. 115.) Obviously, the school district defendants here  Sierra Plumas JUSD, Mattole USD, and Camptonville UESD  are school districts and therefore public entities under the explicit language of this section. Similarly, charter schools are also defined as "`school districts.'" (§ 47612, subd. (c).) Thus, these defendants and the nonprofit public benefit corporations that run them are also public entities for purposes of the UCL.
Finally, we reject Wells's claim the charter schools are not public entities because they are not listed on the "Roster of Public Agencies" kept by the Secretary of State's Office. (Gov.Code, § 53051.) While they are independently operated, we conclude the charter schools are subdivisions of their chartering authorities both because their existence and funding derives from those entities, and because they must answer to those entities to remain in existence. A subdivision of another public agency is not separately required to register with the Secretary of State. (Hovd v. Hayward Unified Sch. Dist. (1977) 74 Cal.App.3d 470, 472, 141 Cal.Rptr. 527.)
For the foregoing reasons, we conclude all of the defendants  the charter schools, their operators, and their chartering school districts  are public entities. Consequently, they are not subject to the reach of the UCL. The trial court did not err in sustaining the demurrer to this cause of action without leave to amend.

III

Peter W. and the Bar of "Educational Malfeasance"
We next turn to plaintiffs' causes of action for breach of contract and misrepresentation. We conclude these causes of *467 action are barred by the doctrine of educational malfeasance.
The starting point is the seminal case of Peter W., supra, 60 Cal.App.3d 814, 131 Cal.Rptr. 854, and its conclusion that educational malfeasance is not actionable. In Peter W., the plaintiff was a high school graduate of the San Francisco Unified School District. (Id. at p. 817, 131 Cal.Rptr. 854.) He sued the district claiming he was inadequately educated and graduated from school with only a fifth-grade reading ability. (Ibid.) He alleged the district violated its mandatory duty to educate him. (Id. at pp. 818, 826, 827, 131 Cal.Rptr. 854.)
Because the defendant was a public entity, the court started with the premise that a "public entity may be held vicariously liable for the conduct of its employee, under Government Code section 815.2, subdivision (a) ... only if it is established that the employee would be personally liable for the conduct upon some `acceptable theory of liability.' [Citation.]" (Peter W., supra, 60 Cal.App.3d at p. 819, 131 Cal.Rptr. 854.) The court rejected the plaintiff's claims he had stated a duty of care under the theory that the assumption of the function of education imposed the duty to exercise reasonable diligence in its discharge. (Id. at p. 820, 131 Cal.Rptr. 854.) Further, the court rejected the plaintiff's special relationship theory of liability, and his theory that educational institutions have a duty to exercise reasonable care in the supervision of children under their care. (Id. at pp. 820-821, 131 Cal.Rptr. 854.)
The court turned to the oft-cited factors of Rowland v. Christian (1968) 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 to determine whether schools had a legally enforceable duty of care to the plaintiff. (Peter W., supra, 60 Cal.App.3d at pp. 822-823, 131 Cal.Rptr. 854.) The court stated, "On occasions when the Supreme Court has opened or sanctioned new areas of tort liability, it has noted that the wrongs and injuries involved were both comprehensible and assessable within the existing judicial framework. [Citations.] This is simply not true of wrongful conduct and injuries allegedly involved in educational malfeasance. Unlike the activity of the highway or the marketplace, classroom methodology affords no readily acceptable standards of care, or cause, or injury. The science of pedagogy itself is fraught with different and conflicting theories of how or what a child should be taught, and any layman might  and commonly does  have his own emphatic views on the subject. The `injury' claimed here is plaintiff's inability to read and write. Substantial professional authority attests that the achievement of literacy in the schools, or its failure, are influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process, and beyond the control of its ministers. They may be physical, neurological, emotional, cultural, environmental; they may be present but not perceived, recognized but not identified." (Id. at p. 824, 131 Cal.Rptr. 854.) The court continued, "[w]e find in this situation no conceivable `workability of a rule of care' against which defendants' alleged conduct may be measured [citation], no reasonable `degree of certainty that ... plaintiff suffered injury' within the meaning of the law of negligence [citation], and no such perceptible `connection between the defendant's conduct and the injury suffered,' as alleged, which would establish a causal link between them within the same meaning." (Id. at p. 825, 131 Cal.Rptr. 854.)
Thus, the court concluded, "[t]hese recognized policy considerations alone negate an actionable `duty of care' in persons and agencies who administer the academic *468 phases of the public educational process.... To hold them to an actionable `duty of care,' in the discharge of their academic functions, would expose them to the tort claims  real or imagined  of disaffected students and parents in countless numbers. They are already beset by social and financial problems which have gone to major litigation, but for which no permanent solution has yet appeared. [Citations.] The ultimate consequences, in terms of public time and money, would burden them  and society  beyond calculation." (Peter W., supra, 60 Cal.App.3d at p. 825, 131 Cal.Rptr. 854.) The court found the school district had no duty of care toward its students. (Ibid.) The court also concluded the plaintiff failed to state a cause of action for negligence. (Ibid.)
For these same policy reasons, the court also rejected the plaintiff's cause of action for negligent misrepresentation based upon the plaintiff's allegations the school district" `falsely and fraudulently represented to plaintiff's mother and natural guardian that plaintiff was performing at or near grade level in basic academic skills such as reading and writing.'" (Peter W., supra, 60 Cal.App.3d at p. 827, 131 Cal.Rptr. 854.) The Peter W. court concluded the plaintiff's intentional misrepresentation claim was barred by Government Code section 818.8 and also because of additional pleading deficiencies. (Ibid.)
The courts have uniformly applied the logic and bar of Peter W. to cases where plaintiffs have sued their public schools for educational malfeasance. (See, e.g., Brown v. Compton Unified School Dist. (1998) 68 Cal.App.4th 114, 80 Cal.Rptr.2d 171; Chevlin v. Los Angeles Community College Dist. (1989) 212 Cal.App.3d 382, 260 Cal.Rptr. 628 (Chevlin); Tirpak v. Los Angeles Unified School Dist. (1986) 187 Cal.App.3d 639, 232 Cal.Rptr. 61 (Tirpak).)
In Tirpak, the court extended the holding of Peter W. to the complete withholding of any educational services when a child was allegedly unlawfully suspended from school. (Tirpak, supra, 187 Cal.App.3d at pp. 641-642, 644-645, 232 Cal.Rptr. 61.) The court held the "wrongful total deprivation of education" was not actionable because the court could find no principled distinction between a bad education and no education at all under the rule announced in Peter W. (Id. at p. 645, 232 Cal.Rptr. 61.)
In Chevlin, the plaintiff attempted an end run around the holding of Peter W. by alleging a breach of contract in her claim against a community college when she was terminated from its nuclear medicine training program. (Chevlin, supra, 212 Cal.App.3d at pp. 386-387, 390, 260 Cal.Rptr. 628.) In concluding her contract cause of action was barred under the educational malfeasance doctrine, the court stated, "We think it obvious that to permit Chevlin to recover under a breach of contract theory based on educational nonfeasance would be tantamount to permitting her to sue for negligence which is precluded under the Peter W. decision. Whether framed as a negligence or breach of contract theory the harm which Chevlin seeks to redress is the same." (Id. at p. 390, 260 Cal.Rptr. 628.) The Chevlin court also concluded the plaintiff's misrepresentation claim under Government Code section 818.8 was barred. (Ibid.)
We draw two lessons from these cases. First, a public school student may not sue a public school because that school failed to properly teach that student. Ultimately, the students, parents, teachers, school boards, and the Legislature must work together in the political and social arenas to resolve the problems within the educational system arising from the quality and manner in which education is delivered *469 to our children. While that "avenue" of redress may have some "potholes" or "`closed for repair signs'" as suggested by Wells, it is the basis for our democracy and the appropriate place for the resolution of these issues.
The second lesson we draw from these cases is no matter what the cause of action, if a plaintiff is suing a public school for damages based upon the quality of education or lack of education, that cause of action is barred.

A

Breach of Contract
Wells argues the trial court erred in dismissing the breach of contract cause of action. We disagree.
Wells asserted breach of contract causes of action against the charter schools, but not the school district defendants. The complaint alleges the charters, oral representations, and individual agreements signed by each of the child and parent plaintiffs with these charter schools form a contract between them. The charters are attached as exhibits to the complaint and generally discuss the governance structure of the charter schools, their education philosophy, the method of education the schools would provide, the objectives for the students, the method by which students would be evaluated, and the areas of study. The individual agreements consist of enrollment application documents welcoming the children to the schools, describing the enrollment process, the strengths of the education process, and the expectations for the parents and for the schools. The individual agreements also contain courses of study, percentages of involvement for students, teachers and parents, and learning goals generally. Wells alleges the charter schools made additional oral promises to provide computers, software, Internet access, textbooks, curriculum, a learning plan, assessment, instruction, testing and evaluation, and reimbursement for educational expenses. Wells alleges the charter schools breached these agreements by failing to fulfill these promises.
As should be evident from our discussion of Peter W., supra, 60 Cal.App.3d 814, 131 Cal.Rptr. 854 and Chevlin, supra, 212 Cal.App.3d at pages 386-387, 390, 260 Cal.Rptr. 628, a claim for educational malfeasance that is pled in the form of a breach of contract claim is barred by the educational malfeasance doctrine. Here, the gravamen of Wells's breach of contract claim is that the charter schools failed to provide plaintiffs with an education. For this breach of contract, plaintiffs seek monetary damages.
Whether this claim is phrased as a partial failure or a complete failure to educate these children, we conclude this claim is barred by the doctrine of educational malfeasance. It calls into play all of the issues identified by Peter W. that led the court to refuse to allow a plaintiff to allege a cause of action for damages against his school for failing to teach him: the lack of readily acceptable standards of care, causation, or injury. (Peter W., supra, 60 Cal.App.3d at p. 824, 131 Cal.Rptr. 854.) It challenges the propriety of the educational method and raises the other unknowable factors that might have interfered with each of these children's ability to learn. (Id. at p. 824, 131 Cal.Rptr. 854.) It raises the issue of the inability to place a measure of damages on these claims for lost learning or to even determine whether the educational method was the basis for any hypothetical "educational injury." (Id. at pp. 824-825, 131 Cal.Rptr. 854.) As a result, we conclude Wells's cause of action is barred.
Even if we were persuaded Wells's breach of contract cause of action *470 did not state a claim for educational malfeasance, we would not allow this cause of action to go forward. It is axiomatic that in order to plead a cause of action for breach of contract, there must be a contract between the parties. (Smith v. City and County of San Francisco (1990) 225 Cal.App.3d 38, 49, 275 Cal.Rptr. 17.)
"[I]t bears underscoring that charter schools are strictly creatures of statute. From how charter schools come into being, to who attends and who can teach, to how they are governed and structured, to funding, accountability and evaluation  the Legislature has plotted all aspects of their existence." (Wilson, supra, 75 Cal.App.4th at p. 1135, 89 Cal.Rptr.2d 745.) The requirements for the petition for a charter and the requirement that the schools have and follow their charter are dictated by sections 47605 and 47610. Moreover, the particular individual agreements between the students and the schools concerning their independent study programs are also creatures of statute. (§§ 46300.7, 51745, 51746; Cal.Code Reg., tit. 5, § 11702.)
As defendants point out, these agreements are fundamentally different from ordinary contracts because charter schools could not sue their students for breach of contract for failing to do their homework. Likewise, charter school students cannot sue their schools for doing a bad job in educating them. Wells's breach of contract cause of action fails.

B

Intentional and Negligent Misrepresentation
Wells also repackaged the barred educational malfeasance claim as intentional and negligent misrepresentation causes of action. These claims also fail under the Peter W. analysis.
Wells's complaint alleges the charter school defendants made promises to Wells with the intent to induce Wells to enroll in their educational programs. At the time defendants made these representations, they knew they were false, or they acted in reckless disregard for the truth or falsity of these statements. As a result of Wells's actual and reasonable reliance on these promises, Wells has been damaged. Wells's damages include the parents' out-of-pocket expenses for educating their children, loss of educational experiences for the children, lost opportunity costs, and emotional distress.
These allegations are no more than a claim for monetary damages based on the contention the charter schools failed to provide the educational experience these children and their parents wanted. A misrepresentation claim is implicit in Peter W.'s analysis of the duty of public schools. It is expected that charter schools will provide books, teachers, and a quality education to the children they enroll. The charter schools' failure to provide these things constitutes educational malfeasance whether the expectations were raised explicitly or implicitly. Whether in tort, contract, or fraud, this claim is barred by the doctrine of educational malfeasance. (Brown v. Compton Unified School Dist., supra, 68 Cal.App.4th 114, 80 Cal.Rptr.2d 171; Chevlin supra, 212 Cal.App.3d 382, 260 Cal.Rptr. 628; Tirpak, supra, 187 Cal.App.3d 639, 232 Cal.Rptr. 61; Peter W., supra, 60 Cal.App.3d 814, 131 Cal.Rptr. 854.) The trial court correctly sustained the demurrer without leave to amend as to this cause of action.

IV

False Claims Act
Wells contends the trial court also erred in concluding Peter W. barred Wells's *471 cause of action under the False Claims Act. Accepting as true Wells's allegation the charter schools and school districts submitted ADA funding requests to the State of California knowing they did not accurately reflect the students enrolled in and receiving instruction, educational materials, or services from these schools, we conclude Wells's False Claim Act cause of action is not for educational malfeasance and the trial court erred in sustaining the demurrer without leave to amend as to this claim.
The False Claims Act provides for civil penalties against anyone who "[k]nowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval." (Gov.Code, § 12651, subd. (a)(1).) A private citizen may pursue a False Claims Act cause of action on behalf of the state or a political subdivision: "A person may bring a civil action for a violation of this article for the person and either for the State of California in the name of the state, if any state funds are involved, or for a political subdivision in the name of the political subdivision, if political subdivision funds are exclusively involved. The person bringing the action shall be referred to as the qui tam plaintiff." (Gov.Code, § 12652, subd. (c)(1).) These lawsuits are commonly referred to as qui tam actions. The False Claims Act is designed to protect the public fisc from those who would defraud the government. (LeVine v. Weis (1998) 68 Cal.App.4th 758, 765, 80 Cal.Rptr.2d 439 (LeVine I).) "The False Claims Act must be construed broadly so as to give the widest possible coverage and effect to the prohibitions and remedies it provides in Government Code section 12653." (Id. at p. 764, 80 Cal.Rptr.2d 439.)
In LeVine I, supra, the plaintiff brought an action for wrongful discharge against the Ventura County Superintendent of Schools. (68 Cal.App.4th at pp. 760-761, 80 Cal.Rptr.2d 439.) The plaintiff was a teacher at juvenile hall responsible for four locked classrooms covering between 40 and 80 students. (Id. at p. 761, 80 Cal.Rptr.2d 439.) In his complaint, the plaintiff alleged he had been discharged in violation of Government Code section 12653[9] of the False Claims Act because he had complained that the school district had failed to adequately staff the classrooms for which it was receiving state educational money. (Id. at pp. 761-762, 764, 80 Cal.Rptr.2d 439.)
The Ventura County Superintendent of Schools claimed the False Claims Act did not apply to it because it was a governmental entity and not a "person" as defined under the False Claims Act, citing cases that conclude public entities are not persons under similar definitions. (LeVine I, supra, 68 Cal.App.4th at p. 764, 80 Cal.Rptr.2d 439.) Under the False Claims Act, a person "includes any natural person, corporation, firm, association, organization, partnership, business, or trust." (Gov.Code, § 12650, subd. (e).)
The court held the Ventura County Superintendent of Schools could fall within the definition of a "person" as an "association" or "organization." (LeVine I, supra, 68 Cal.App.4th, at p. 764, 80 Cal.Rptr.2d 439.) "The definition of `person' must be read in light of the context and purpose of the statute. There is no reason to conclude the Legislature intended that the protection afforded to the public treasury *472 by the [False Claims Act] be denied merely because the entity raiding the treasury is a governmental entity." (Id. at p. 765, 80 Cal.Rptr.2d 439.)
The LeVine I court distinguished Community Memorial Hospital v. County of Ventura, supra, 50 Cal.App.4th 199, 56 Cal.Rptr.2d 732, which as we have already stated, concluded the UCL does not apply to a county hospital. The LeVine I court concluded, "A county may have the sovereign power to fulfill its duty to guard the public health free from regulations that govern ordinary business. But no governmental agency has the power, sovereign or otherwise, knowingly to present a false claim. The very notion is repugnant to how government should operate by and for the people." (LeVine I, supra, 68 Cal.App.4th at p. 765, 80 Cal.Rptr.2d 439.) Thus, the appellate court held the False Claims Act applies to public entities. We agree.[10]
Defendants urge this court to conclude LeVine I is not instructive here because it was a "wrongful termination" action, and had nothing to do with educational malfeasance. We reject this argument. It is true LeVine I concerned the wrongful termination of an employee who reported false claims. (68 Cal.App.4th 760, 80 Cal.Rptr.2d 439.) But the court relied on the purpose behind the law  protecting the public fisc  to conclude the False Claims Act applied to public entities. (Id. at pp. 764-765, 80 Cal.Rptr.2d 439.) That purpose distinguishes a False Claims Act cause of action (where public entities are included) from the UCL cause of action (where public entities are excluded). Moreover, the reasons for applying the logic of LeVine I to the facts of this case are even more compelling. Here, Wells seeks reimbursement for the state (not for Wells), thus fulfilling the fundamental purposes of the False Claims Act of protecting the public fisc.
We must now turn to the substance of the claims pled by Wells to determine whether they constitute claims for educational malfeasance, i.e., claims for damages for the failure of the schools to educate them. Wells's False Claims Act cause of action asserts two bases for recovery  obtaining ADA funds to which the charter schools were not entitled and specific violations of section 51747.3.

A

Receipt of Funds to Which they are not Entitled
We first turn to Wells's allegation the charter schools violated the False Claims Act because they "request[ed] funding from [school district defendants] and/or the STATE OF CALIFORNIA, knowing that their ADA records did not accurately reflect the students enrolled in and receiving instruction, educational materials, or services from their schools, the actual cost of the materials and services to defendants, or the amounts that defendants were actually paying to parents/guardians or third parties to reimburse parents/guardians' for their out-of-pocket educational expenses." Wells further claims the school district defendants "claimed funds from the STATE OF CALIFORNIA *473 on behalf of" the charter schools. Wells pled the school districts "knew or deliberately or recklessly disregarded whether the public funds were being used for wrongful purposes."[11] Further, Wells alleged the school districts wrongfully claimed funds in excess of what they were entitled under the Charter Schools Act.
Defendants attempt to characterize these allegations as challenging the adequacy of the educational experience received by the students and argue they raise only a claim of educational malfeasance that is barred by Peter W. We disagree. We conclude these allegations are susceptible to the interpretation that these defendants have made false statements to the state to obtain state ADA funds.
As we noted above, claims for educational malfeasance are barred because the wrongs and injuries are not comprehensible and assessable within our existing judicial framework. (Peter W., supra, 60 Cal.App.3d at p. 824, 131 Cal.Rptr. 854.) Classroom methodology poses no readily acceptable standards of care, or for causation, or for injury. (Ibid.) Other unrelated and unquantifiable factors may interfere with learning. (Ibid.) Reasonable people can and do disagree on the proper methods for education. For these reasons, the courts have declined to allow students and teachers to burden the school system with expensive and time-consuming litigation.
Here, none of these policy considerations enter the calculus of resolving Wells's False Claims Act cause of action. By this first theory, Wells has simply alleged defendants have submitted false claims for ADA funds for children to whom they have provided nothing more than the "service" of the timely collection of attendance sheet signatures. A charter school that seeks money from the State of California for doing nothing more than collecting attendance sheets from children has submitted a false claim to the state when it asserts it has provided those children with education. The gravamen of the wrong and injury alleged here is straightforward and comprehensible  the defrauding of the state. The duty is to submit honest claims. The breach is submitting a false claim. The measure of the injury to the state is the funds the defendants obtained based upon their fraud. These are bread-and-butter issues of the judicial system which are litigated on a daily basis, not the amorphous problems of an educational malfeasance claim.
Importantly, the issues raised by a False Claim Act cause of action are independent from classroom methodology, the quality of the learning, whether a particular child or group of children learned anything from the method in which they were taught, and any damage that an ineffective teaching program may inflict on the children who attend it. Those issues have nothing to do with the claim the state is being defrauded by a charter school operator. In short, none of the factors the Peter W. court relied upon to conclude there existed no cause of action for educational malfeasance is present in this cause of action. (Peter W., supra, 60 Cal.App.3d at 825, 131 Cal.Rptr. 854.) This claim has everything to do with protecting state and local government fisc. Such a lawsuit does not infringe on any sovereign power of the schools to teach because they *474 do not have the sovereign power to fraudulently obtain state funds.
Furthermore, as we have mentioned, under this cause of action, Joey Wells and his coplaintiffs do not seek to recover damages for themselves for their failed educations. Instead, in their representative capacity as the qui tam plaintiffs, they seek to return to the government money Wells alleges these defendants wrongfully obtained. In this sense, a False Claims Act cause of action is markedly different from an educational malfeasance claim where a plaintiff seeks to recover damages for the failure of the school to educate him or her.
We thus conclude the educational malfeasance doctrine of Peter W. has no application to Wells's False Claims Act cause of action. The trial court's conclusion to the contrary was erroneous.

B

Restrictions on Enrollment of Independent Study Students
Wells also alleges in the False Claims Act cause of action that: 1) the charter schools "claimed funds for students participating in independent study and residing outside of the county in which their school was chartered or an adjacent county"; and 2) they submitted ADA funding requests "for [students to whom they] provided funds or other things of value to students and their parents or guardians [sic], while such funds and things are not provided for students who attend regular classes." Wells alleges these actions violate section 51747.3, subdivisions (a) and (b). The trial court found no claim stated because section 51747.3, subdivision (b) did not apply to charter schools before January 2000 and all of Wells's allegations predated that. We agree.
As originally enacted in 1993, section 51747.3 provided, in relevant part: "(a) No local education agency may claim state funding for the independent study of a pupil, whether characterized as home study or otherwise, if the agency has provided any funds or other thing of value to the pupil or his or her parent or guardian that the agency does not provide to students who attend regular classes or to their parents or guardians. [¶] (b) Notwithstanding any other provision of law, community school and independent study average daily attendance shall be claimed by school districts and county superintendents of schools only for pupils who are residents of the county in which the apportionment claim is reported, or who are residents of a county immediately adjacent to the county in which the apportionment claim is reported."[12] (Stats. 1993, ch. 66, § 32, p. 923.)
The Charter Schools Act[13] has always provided that admission to a charter school may not be based upon the residence of the child. (§ 47605, former subdivision (d) [now subdivision (d)(1)].) Further, section 47610 originally stated, "A charter school shall comply with all of the provisions set forth in its charter petition, but is otherwise *475 exempt from the laws governing school districts except as specified in Section 47611." (Stats. 1992, ch. 781, § 1.)[14]
When section 51747.3 was enacted in 1993, it was placed in a separate part of division 4 of title 2. It was codified as part of an article of the Education Code concerning independent study.[15]
Thus, given the exemption of charter schools (contained in Section 47610) from following other statutory mandates and the separation of the law on independent study from the Charter School Act within the Education Code, the prohibitions related to independent study programs codified in section 51747.3 did not apply to charter schools.
The Legislature recognized this when it amended the independent study laws in 1999. At that time, section 51747.3 was amended specifically to include charter schools. As explained by the Legislative Counsel's Digest that accompanied the 1999 law: "Existing law requires community school and independent study average daily attendance to be claimed by school districts and county superintendents of schools only for pupils who are residents of the county in which the apportionment claim is reported or pupils who are residents of a county immediately adjacent to the county in which the apportionment claim is reported. [¶] This bill would apply this provision also to charter schools." (Stats. 1999, ch. 162, p. 1.) Similarly, it wrote, "Existing law prohibits a local education agency from claiming state funding for the independent study of a pupil, whether characterized as home study or otherwise, if the agency has provided any funds or other thing of value to the pupil or his or her parent or guardian that the agency does not provide to pupils who attend regular classes or to their parents or guardians. [¶] This bill would make this prohibition applicable to charter schools." (Stats. 1999, ch. 162, p. 1; see also, Sen. Ed. Comm., Bill Analysis of Sen. Bill No. 434 (1999-2000 Reg. Sess.) as amended June 28, 1999.)
All of the allegations contained in the complaint predate January 1, 2000, the effective date of the amendment. Since section 51747.3 did not apply to charter schools before that date, the trial court did not err in concluding Wells failed to state any cause of action under this statute.

C

The Tort Claims Act does not Apply to the False Claims Act
The trial court also concluded Wells failed to properly plead compliance with the Tort Claims Act and sustained the demurrer with leave to amend on that basis.[16] We agree with Wells and the Attorney General that the Tort Claims Act does not apply to qui tam actions brought *476 on behalf of the state against public entities.
Government Code sections 905, 910, and 911.2 require a plaintiff to file a timely tort claim with a public entity as a jurisdictional prerequisite to filing a suit for damages. (Watson v. State of California (1993) 21 Cal.App.4th 836, 843-844, 26 Cal.Rptr.2d 262.) A claim relating to any cause of action other than injury to person or personal property shall be presented no later than one year after the accrual of the cause of action. (Gov.Code, § 911.2.)
However, Government Code section 905, subdivision (i) provides an exemption from the claims presentment requirement for "[c]laims by the State or by a state department or agency or by another local public entity."
The False Claims Act places a qui tam plaintiff in the shoes of the state. As we have already noted, a private person may bring a qui tam action in the name of the state or the public entity whose funds are involved. (Gov.Code, § 12652, subd. (c)(1).) "Once filed, the action may be dismissed only with the written consent of the court, taking into account the best interests of the parties involved and the public purposes behind this act." (Ibid.) "If the state or political subdivision elects not to proceed, the qui tam plaintiff shall have the same right to conduct the action as the Attorney General or prosecuting authority would have had if it had chosen to proceed under subdivision (c)." (Gov.Code, § 12652, subd. (f)(1).)
Reading the False Claims Act and the Tort Claims Act sections in harmony, we conclude a qui tam plaintiff who is pursuing a False Claims Act cause of action on behalf of the state falls within the Tort Claims Act exception to the presentment requirement of Government Code section 905, subdivision (i).
This holding furthers important policy considerations of the False Claims Act. A plaintiff must file a qui tam complaint in camera where it remains under seal. (Gov.Code, § 12652, subd. (c)(2.)[17] A qui tam plaintiff must also forward a copy of the complaint to the Attorney General's Office. (Gov.Code, § 12652, subd.(c)(3).)[18] The Attorney General must "diligently investigate violations under Section 12651 involving state funds." (Gov.Code, § 12652, subd. (a)(1).) The seal requirement "allow[s] the Government an adequate opportunity to fully evaluate the private enforcement suit and determine both if that suit involves matters the Government is already investigating and whether it is in the Government's interest to intervene and take over the civil action." (U.S. ex rel. Lujan v. Hughes Aircraft Co. (9th Cir.1995) 67 F.3d 242, 245.)[19] By filing the lawsuit under seal, the potential subject is not alerted to an ongoing or future government investigation. (See id. at p. 246 [government's investigation could not have been hampered by violation of seal *477 requirement if defendant knew of the allegations of the qui tam action before plaintiff improperly disclosed the nature of the allegations of the lawsuit].)
If the plaintiff in a qui tam action were required to present a claim to the offending agency, this would defeat the purpose of filing the complaint under seal and interfere with the Attorney General's ability to investigate fraud and corruption.
On the other hand, "`[t]he "purpose of the [statutory requirements for presenting claims against the state or a local public entity] is to facilitate early investigation of disputes and settlement without trial if appropriate, as well as to enable the public entity to engage in fiscal planning for potential liabilities and to avoid similar liabilities in the future."' [Citation.]" (Gatto v. County of Sonoma (2002) 98 Cal.App.4th 744, 763, 120 Cal.Rptr.2d 550.) Prior to the decision of the Attorney General to intervene, a qui tam plaintiff has no authority to settle a claim without court review or the participation of the injured party, i.e., the state. (Gov.Code, § 12652, subd. (c)(1) & (c)(4).) Once the government intervenes, it may settle the action over the objections of the qui tam plaintiff provided the qui tam plaintiff has received notice and an opportunity to be heard. (Gov.Code, § 12652, subd. (e)(2)(B).) Thus, requiring a claim to be presented to the school districts would not allow for early settlement and would not serve a key purpose of the claims presentment statute.
We therefore hold a plaintiff need not file a tort claim with a public entity prior to filing a complaint under the False Claims Act.

DISPOSITION
The judgment is reversed and remanded for further proceedings.[20] The trial court is directed to vacate that part of its order sustaining the demurrers without leave to amend as to the first cause of action for violations of the False Claims Act and directed to overrule the demurrer as to that cause of action. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a).)[21]
We concur: NICHOLSON, Acting P.J., and RAYE, J.
NOTES
[1] Hereafter the Charter Schools Act.
[2] All further statutory references are to the Education Code unless otherwise indicated.
[3] Government Code section 12650 et seq.
[4] Wells's complaint also alleged separate causes of action for: (1) injunctive relief as a taxpayer action; (2) a writ of mandate; (3) violation of state constitutional provisions; and (4) declaratory relief. These causes of action are not the subject of this appeal.
[5] Now known as Axis 4 Learning.
[6] Government Code section 810 et seq.
[7] After the demurrers were sustained without leave to amend as to the causes of action at issue here, plaintiffs dismissed the remaining causes of action by stipulation, and the trial court entered judgment in favor of defendants on October 4, 2002.
[8] The chartering authority, however, is not liable for the debts and liabilities of the nonprofit public benefit corporation. (§ 47604, subd. (c).) Wells argues this is evidence charter schools cannot be public entities. We disagree. This subdivision only establishes charter schools are separate from their chartering authorities in terms of fiscal responsibility. It does not prevent us from concluding these schools are public entities for purposes of the UCL.
[9] Under Government Code section 12653, subdivision (b), "No employer shall discharge ... an employee ... because of lawful acts done by the employee on behalf of the employee or others in disclosing information to a government or law enforcement agency or in furthering a false claims action."
[10] Sierra Summit Academy argues the public entities at issue here are not subject to the False Claims Act because they are arms of the state. The LeVine I court rejected this claim. (LeVine I, supra, 68 Cal.App.4th at p. 765-766, 80 Cal.Rptr.2d 439.) Moreover, the United States Supreme Court has held municipalities are persons subject to the federal False Claims Act despite the fact that they are considered arms of the state. (Cook County v. United States ex rel. Chandler (2003) 538 U.S. 119, 132-134 [155 L.Ed.2d 247, 259-260].) We reject this argument for the same reasons.
[11] Sierra Plumas JUSD contends it cannot be liable for Sierra Summit Academy's False Claims Act liabilities because section 47604, subdivision (c), shields the public chartering entities from the debts of their charter schools. While this is true, the allegations of the complaint demonstrate that Wells seeks to hold Sierra Plumas JUSD liable for its own misdeeds, not those of its charter school.
[12] This section also contained language identical to the current statute that stated, "The provisions of this section are not subject to waiver by the State Board of Education, by the State Superintendent of Public Instruction, or under any provision of [the Charter Schools Act.]" In 1995, the Attorney General concluded this portion of the statute meant that charter schools were subject to the terms of section 51747.3. (78 Ops.Cal.Atty.Gen. 253, 257-258 (1995).) In light of our conclusion that the law in effect prior to January 1, 2000, did not apply to charter schools (see post), we conclude this portion of the Attorney General's opinion is erroneous.
[13] The Charter Schools Act is codified at part 26.8 of division 4 of title 2.
[14] Now that provision reads, "A charter school shall comply with this part and all of the provisions set forth in its charter, but is otherwise exempt from the laws governing school districts except all of the following: [¶] (a) As specified in Section 47611.[¶] (b) As specified in Section 41365.[¶] (c) All laws establishing minimum age for public school attendance." (§ 47610.)
[15] Article 5.5 of chapter 5 of part 28 of division 4 of title 2.
[16] Here, Wells's pleading alleges Wells has "presented claims for money or damages to the public entity defendants pursuant to the requirements of Government Code 945.4, which have been denied, and/or have sought relief from the claims presentation requirements." The pleading fails to state Wells had obtained relief from the claims presentation requirements and actually presented a tort claim for those claims which had subsequently been denied by the public agency.
[17] Government Code section 12652, subdivision (c)(2) provides, "A complaint filed by a private person under this subdivision shall be filed in superior court in camera and may remain under seal for up to 60 days."
[18] Government Code section 12652, subdivision (c)(3) provides, "On the same day as the complaint is filed pursuant to paragraph (2), the qui tam plaintiff shall serve by mail with `return receipt requested' the Attorney General with a copy of the complaint and a written disclosure of substantially all material evidence and information the person possesses."
[19] "The California False Claims Act is patterned on similar federal legislation. [Citation.] Accordingly, federal decisions are persuasive on the meaning of the act." (Laraway v. Sutro & Co. (2002) 96 Cal.App.4th 266, 274-275, 116 Cal.Rptr.2d 823.)
[20] We, of course, express no opinion on the merits of the claims in the complaint.
[21] We deny Wells's motion to strike the appendix of respondent Charter School Resource Alliance.